United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

No. 96-1559
_____

| | | |
|---|---|---|
| Ari Parnes; Deborah Slyne; Corey Emert; Faye Martin Anderson; Edward R. Pepper, on behalf of themselves and all others similarly situated, | * * * * * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Gateway 2000, Inc.; Theodore W. Waitt; Richard D. Snyder; James Cravens; George H. Krauss; Douglas L. Lacey; Norman W. Waitt, Jr., | * * * * * | |
| Appellees. | * | |
| ----------------------------- | * * | |
| Faye Martin Anderson, on behalf of herself and all others similarly situated, | * * * | |
| Appellant, | * * | |
| v. | * * | |
| Gateway 2000, Inc.; Theodore W. Waitt; Richard D. Snyder; James Cravens; George H. Krauss; Douglas L. Lacey, | * * * * * | |
| Appellees. | * | |

_____

Submitted: December 12, 1996
Filed: August 8, 1997
_____

Before McMILLIAN and MAGILL,[1] Circuit Judges, and WEBBER,[2] District Judge.
_____

MAGILL, Circuit Judge.

The Plaintiffs are individual investors[3] who purchased Gateway 2000, Inc. (Gateway) stock soon after the stock was publicly offered. The stock subsequently decreased in value after Gateway revealed disappointing earnings, and the Plaintiffs brought this securities fraud suit against Gateway and Gateway's corporate officers,

_____

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]THE HONORABLE E. RICHARD WEBBER, United States District Judge for the Eastern District of Missouri, sitting by designation.

[3]The Plaintiffs are Ari Parnes, who purchased 50 shares of Gateway common stock after December 7, 1993, and before June 23, 1994; Deborah Slyne, who purchased 300 shares of Gateway common stock during the same period; Corey Emert, who purchased 200 shares of Gateway common stock during the same period; Faye Martin Anderson, who purchased 500 shares of Gateway common stock during the same period; Craig Langweiler, who purchased 200 shares of Gateway common stock during the same period; and Edward R. Pepper, who purchased 7000 shares of Gateway common stock during the same period. The Plaintiffs sought certification as a class, but this motion was denied as moot by the district court when it dismissed their complaint. See Mem. Op. and Order I at 17.

directors, and principal shareholders (Defendants).[4]  The Plaintiffs allege that the

---

[4]The Plaintiffs also brought suit against Goldman Sachs & Co. and Painewebber, Inc., which underwrote Gateway's offer of stock to the public.  The Plaintiffs' claims against the underwriters were voluntarily dismissed without prejudice on January 17, 1995.

Defendants violated securities laws by misrepresenting facts in Gateway's prospectus, registration statement, and other company communications and by committing fraud on the market. The district court[5] dismissed the Plaintiffs' complaint for failure to state a claim and for failure to plead fraud with sufficient particularity. After dismissal, the Plaintiffs sought leave to file an amended complaint, which the district court denied. The Plaintiffs now appeal, and we affirm.

## I.

Gateway, founded in 1985 by Theodore Waitt and Michael Hammond, is a South Dakota-based manufacturer and direct marketer of personal computers. Gateway was initially created as a Subchapter S corporation, and the bulk of Gateway's stock was held by Theodore Waite and his brother Norman. The company grew dramatically between 1985 and 1993, reaching sales of more than a billion dollars per year.[6] On

---

[5]The Honorable John B. Jones, United States District Judge for the District of South Dakota.

[6]In its prospectus, Gateway describes itself as

the leading direct marketer of personal computers in the United States. The Company develops, markets, manufactures and supports a product line of IBM-compatible desktop, notebook and subnotebook PCs for use by businesses, individuals, government agencies and educational institutions. On October 1, 1993, the Company entered the European market with the opening of a facility in Dublin, Ireland. Founded in 1985, Gateway 2000 has sold over 1.3 million PCs and has increased its net sales from approximately $11.8 million in 1988 to over $1.5 billion for the twelve months ended September 30, 1993.

December 7, 1993, Gateway became a public corporation and, pursuant to a registration statement and prospectus, offered stock to the public.

While expressing confidence in its likely continued growth, see Prospectus (Dec. 7, 1993) at 6, Gateway's prospectus contains a variety of warnings to prospective investors. The prospectus explains that,

> [a]lthough the Company anticipates significant growth in the future, it does not expect its growth to continue at the rates previously experienced. The Company's operating results for the fourth quarter of 1993 are expected to reflect the growth historically experienced by the Company in its fourth quarters, although not necessarily at the rates previously experienced.

Prospectus at 3. In addition, the front cover of the prospectus contains, in bold type, a reference to "Risk Factors." The text of the prospectus includes a description of sixteen risk factors. These risk factors include:

**Short Product Life Cycles**

> To maintain its competitive position in the PC industry, the Company must continue to introduce new products and features that address the needs and preferences of its target consumer markets. The PC industry is characterized by short product life cycles resulting from rapid changes in technology and consumer preference and declining product prices. In 1993, the Company

---

Prospectus (Dec. 7, 1993) at 3.

has introduced numerous new products and features. There can be no assurance that these products or features will be successful, that the introduction of new products or features by the Company or its competitors will not materially and adversely affect the sale of the Company's existing products or that the Company will be able to adapt to future changes in the PC industry. . . .

**Management of Growth**

From its inception, the Company has experienced a rapid rate of growth. Although the Company attempts to forecast growth accurately, the Company has experienced, and may continue to experience, problems with respect to the size of its work force and production facilities and the adequacy of its management information systems and inventory controls. These problems can result in a high backlog of product orders and delays in customer service and support. . . .

**Potential for Fluctuating Operating Results**

The PC industry generally has been subject to seasonality and to significant quarterly and annual fluctuations in operating results. The Company's operating results are also subject to such fluctuations. Fluctuations can result from a wide variety of factors affecting the Company and its competitors, including new product developments or introductions, availability of components, changes in product mix and pricing and product reviews and other media coverage. . . .

**Potential Liability for Sales, Use or Income Taxes**

The Company does not collect or remit sales and use taxes with respect to its sales in any state other than the State of South Dakota, where its physical plant and employees are located. It does not pay income taxes in any state (South Dakota currently has no corporate income tax) and pays franchise taxes only to Delaware and South Dakota. Taxing authorities in certain other states have solicited information from the Company to determine whether the Company has sufficient contacts with such states as would require payment of income taxes or collection of

sales and use taxes from customers in those states. The Company has not paid any such income or sales and use taxes for any prior period, nor has it established any reserves for payment of such taxes. The Company believes that any amount it might ultimately be required to pay for prior periods would not have a material adverse impact on its results of operations or financial condition, but there can be no assurance that there would not be such an effect.

In the future, the Company may be required to collect sales and use taxes or to pay state income and franchise taxes in states other than South Dakota. Although any requirement to collect sales or use taxes in the future could negatively affect the Company's sales, the Company believes the collection of such taxes would not have a material adverse effect on the Company's results of operations or financial condition. However, there can be no assurance that there would not be such an effect. . . .

**Absence of Public Market and Possible Volatility of Stock Price**

There has been no public market for the Common Stock prior to the Offerings, and there can be no assurance that a significant public market for the Common Stock will develop or will continue after the Offerings. The market price for the Company's Common Stock may be highly volatile. The Company believes factors such as product announcements by the Company, or its competitors or suppliers, or quarterly variances in financial results could cause the market price of the Common Stock to fluctuate substantially. . . .

Prospectus at 7-10.

Gateway offered 11.7 million shares of stock at a price of $15 per share. Roughly half of the income generated by the stock sales was distributed to the Waite brothers, in part to satisfy Gateway-related tax liabilities. In the months that followed, Gateway stock climbed to a high of $24-3/4 price per share.

The fourth quarter results of 1993, which were announced on February 10, 1994, showed $545.9 million in revenues, an increase of 36% over the third quarter of 1993 and 54% over the fourth quarter of 1992. The first quarter of 1994 showed $615.9 million in revenues, but a decline in per share earnings. Following the announcement of the decline in earnings, price per share of Gateway stock dropped from $20-7/16 to $15-1/2. The earnings per share dropped again during the second quarter of 1994, and the price of Gateway stock plummeted to $9-1/4 per share on June 23, 1994. The

announced reasons for Gateway's reduced earnings included product transitions, unanticipated sales mix, and technical problems with a new line of portable computers. To address these problems, the company took cash reserves and wrote-down against inventory and accounts receivables of $20 million.

Between June 27, 1994, and July 1, 1994, the Plaintiffs filed three identical class-action complaints against the Defendants. The actions were consolidated in the district court, and the Plaintiffs were given leave to file an amended complaint.[7] In count I of the amended complaint, the Plaintiffs allege violations by the Defendants of Section 11 of the Securities Act of 1933, codified at 15 U.S.C. § 77k (misrepresentation or omission of a material fact in a registration statement) (Section 11). In count II of the amended complaint, the Plaintiffs allege a violation by the Defendants of Section 12(2) of the Securities Act of 1933, codified at 15 U.S.C. § 77l (misrepresentation or omission of material fact in a prospectus or communication) (Section 12(2)). In count III of the amended complaint, the Plaintiffs allege a violation by the Defendants of Section 15 of the Securities Act of 1933, codified at 15 U.S.C. § 77o (liability for controlling persons) (Section 15). In count IV of the amended complaint, the Plaintiffs allege a violation by the Defendants of Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j, and SEC Rule 10b-5 (fraudulent security transaction)

---

[7]The district court ordered that the record in this case be sealed, and the parties' briefs were filed under seal. See Clerk's Order (July 19, 1996) at 1. The parties have agreed that the briefs no longer need to be sealed. Accordingly, we order that the briefs in this case be unsealed.

(Section 10(b) and Rule 10b-5). In count V of the amended complaint, the Plaintiffs allege a violation by the Defendants of Section 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78t (liability for controlling persons) (Section 20(a)).

As the basis for these assertions, the Plaintiffs allege--based almost exclusively on information and belief--that the Defendants engaged in a variety of wrongdoing to

artificially inflate the price of Gateway stock. The Plaintiffs contend that in Gateway's prospectus the Defendants: (1) overstated earnings in 1993 and 1994 by failing to adequately reserve for uncollectible accounts receivable, failing to make adequate reserves for product returns, and failing to write down inventories in a timely fashion; (2) misrepresented Gateway's prospect for growth; (3) misrepresented the existence and extent of obsolete and defective inventories; (4) misrepresented that Gateway's reserves for doubtful accounts receivable were adequate, thereby overstating Gateway's assets by at least $6.8 million; (5) misrepresented the quality of Gateway's new portable computers, which suffered from malfunctioning track-balls and malfunctioning power supplies; (6) misrepresented serious deficiencies of Gateway's purchasing and inventory control systems, management information and order systems, and management and forecasting procedures; and (7) misrepresented Gateway's obligations to pay sales taxes to states other than South Dakota.

In addition, the Plaintiffs allege that the Defendants committed fraud by meeting with and misleading security analysts and by issuing press releases, broker's reports, an Annual Report, and a first quarter report which were misleading. The Plaintiffs also allege that the individual defendants who controlled Gateway Service Corporation (GSC) had GSC purchase Gateway products at inflated prices, thereby artificially inflating Gateway's profits.

The district court issued two decisions disposing of this case. The first decision dismissed the Plaintiffs'

-13-

first amended complaint.  Following this dismissal, the Plaintiffs filed Federal Rules of Civil Procedure 59(e) and 60(b) motions, and sought to file another amended complaint.  The district court's second decision denied the Plaintiffs' Rules 59(e) and 60(b) motions and denied the Plaintiffs' motion to amend their first amended complaint after dismissal.

In dismissing the Plaintiffs' first amended complaint, the district court held that all of the Plaintiffs' allegations of fraud failed to state the circumstances of fraud with

sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).  The district court accordingly struck count IV of the Plaintiffs' complaint, which alleged Section 10(b) and Rule 10b-5 violations.  The district court further held that, based on the bespeaks caution doctrine, most of the of the alleged misrepresentations were immaterial as a matter of law, and that liability could therefore not attach.  The district court also held that a failure to discount $6.8 million from a company with assets of $343,769,000 and earnings of $68,645,000 was not material as a matter of law.  The district court therefore dismissed count II of the complaint, which alleged Section 11 violations, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

The district court originally dismissed count I of the complaint, which alleged Section 11 violations, because the Plaintiffs failed to refer to material misrepresentations or omissions in the registration statement, but instead referred only to the prospectus. In its second decision, the district court held that, even if this was an improper basis for dismissing count I, the district court would have dismissed count I because all of the alleged misrepresentations were immaterial.[8]

---

[8]The Plaintiffs argue, and we agree, that the district court erred in dismissing count I for the Plaintiffs' failure to refer specifically to Gateway's registration statement in their complaint.  The Defendants have acknowledged that Gateway's prospectus was filed as part of its registration statement, see Appellees' Br. at 3, and the Plaintiffs' reference in their complaint to the prospectus necessarily referred to the registration statement as well.  As is discussed below, however, we affirm the district court's dismissal of count I on the alternative basis provided in the district court's second memorandum decision.

Because the Section 10(b), Rule 10b-5, Section 11, and Section 12(2) counts had been dismissed, the district court also dismissed counts III and V, which alleged controlling person liability under Section 15 and Section 20(a), for failure to state a claim.

In its second decision, the district court examined the Plaintiffs' proposed complaint and determined that the Plaintiffs' modifications did not save the complaint. Relying on much the same reasoning as in its first decision, the district court held that the Plaintiffs had failed to plead fraud with sufficient particularity to satisfy Rule 9(b), that the bespeaks caution doctrine rendered immaterial most of the Defendants' alleged misrepresentations, and that the Defendants' alleged failure to discount $6.8 million was immaterial in light of Gateway's earnings and assets.

The Plaintiffs now appeal. On appeal, the Plaintiffs argue that the district court misapplied the bespeaks caution doctrine when it dismissed the Plaintiffs' Section 11 and Section 12(2) claims for lack of materiality. The Plaintiffs also argue that materiality is necessarily a jury question and that the district court erred in ruling on materiality as a matter of law. In addition, the Plaintiffs contend that, because their complaint satisfied Rule 9(b)'s particularity requirement, the district court erred in dismissing their Section 10(b) and Rule 10b-5 claims. Finally, the Plaintiffs argue that the district court abused its discretion in dismissing the complaint with prejudice and in denying the Plaintiffs leave to amend.

**II.**

In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6),[9] this

---

[9]In granting the Defendants' motion to dismiss, the district court considered the prospectus which accompanied Gateway's December 7, 1993 offer of stock to the public.  See Mem. Op. and Order I at 11.  Normally, a district court's decision to consider matters outside of the pleadings will transform a motion to dismiss for failure to state a claim into a motion for summary judgment.  See Fed. R. Civ. P. 12(b). However, "[i]n the event that a plaintiff alleges a claim based on a prospectus, as is the case here, the court may consider the prospectus in ruling on a Rule 12(b)(6) motion even if the prospectus was not attached to the complaint . . . ."  Maywalt v. Parker & Parsley Petroleum Co., 808 F. Supp. 1037, 1045-46 (S.D.N.Y. 1992) (citing cases); see also In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 n.9 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (quotations and citation omitted)).

Court "is constrained by a stringent standard . . . . A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982) (quotations and citations omitted).  In addition,

> [a] complaint must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations.  Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

Id. (quotations and citations omitted).

To present a cognizable claim for securities fraud, a plaintiff must allege that a defendant made misrepresentations that were material.  See Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 208-09 (4th Cir. 1994).  Accordingly, a complaint that alleges only immaterial misrepresentations presents an "insuperable bar to relief," Fusco, 676 F.2d at 334 (quotations omitted), and dismissal of such a complaint is proper.

The Plaintiffs argue that the district court erred in determining the materiality of the Defendants' alleged misrepresentations as a matter of law, because materiality

-19-

is necessarily a factual question for a jury to decide. We disagree.

A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quotations and citations omitted). In many circumstances, of course, this presents a factual question for a jury to decide. See, e.g., In re Control Data Corp. Sec. Litig., 933 F.2d 616, 621 (8th Cir. 1991) ("Determination of whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question. The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a reasonable investor would draw from a given set of facts." (citations and quotations omitted)). Where a reasonable investor could not have been swayed by an alleged misrepresentation, however, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial. See, e.g., Hillson, 42 F.3d at 211.

There are a variety of reasons why an alleged misrepresentation or omission may, as a matter of law, be immaterial. Some matters are such common knowledge that a reasonable investor can be presumed to understand them. Id. at 213-14 ("It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." (quotations and citations omitted)). For example, "[a]s a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals. '[T]echnical obsolescence of computer equipment in a field marked by

rapid technological advances is information within the public domain.'"  In re Convergent Technologies Sec. Litig., 948 F.2d 507, 513 (9th Cir. 1991) (quoting In re Seagate Tech. II Sec. Litig., Fed. Sec. L. Rep. (CCH) ¶ 94,502 at 93,202 (N.D. Cal. 1989) (parentheses omitted)).

Alleged misrepresentations may also present or conceal such insignificant data that, in the total mix of information, it simply would not matter to a reasonable investor.

In this case, the district court concluded, and we agree, that the Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law. Taken in context, this amount represented only 2% of Gateway's total assets. It seems clear that a reasonable investor, faced with a high-risk/high-yield investment opportunity in a company with a history of very rapid growth, would not have been put off by an asset column that was 2% smaller. While there may certainly be many cases where this amount of money would be material and would dramatically affect the total mix of information relied on by a reasonable investor, this simply is not the situation in this case.

Furthermore, some statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them. "The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time." Hillson, 42 F.3d at 213 (quotations and citation omitted). The Hillson court explained that "soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." Id. at 211 (citations and quotations omitted); see also Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements that a company would not "compromise its financial integrity," had a "commitment to create earnings opportunities," and that these "business strategies would lead to continued prosperity" were

"precisely the type of puffery that this and other circuits have consistently held to be inactionable." (quotations omitted)); <u>Searls v. Glasser</u>, 64 F.3d 1061, 1066 (7th Cir. 1995) (Use of phrase "recession-resistant" "is simply too vague to constitute a material statement of fact. . . . It is a promotional phrase used to champion the company but is devoid of any substantive information. Just as indefinite predictions of 'growth' are better describe as puffery rather than as material statements of fact, describing a company as 'recession-resistant' lacks the requisite specificity to be considered anything but optimistic rhetoric. Its lack of

specificity precludes it from being deemed material; it contains no useful information upon which a reasonable investor would base a decision to invest." (citation omitted)).

The Plaintiffs' complaint is filled with allegations that precisely these types of "puffing" statements made by the Defendants in Gateway's prospectus and other communications were misrepresentations. For example, the Plaintiffs allege that the Defendants' projection in Gateway's prospectus of "significant growth" was misleading.  See Am. Compl. at 38, 44-45.  As the Fourth Circuit has explained,

> Predictions on future growth . . . will almost always prove to be wrong in hindsight.  If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out.  As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five.  If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty.  Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer.  We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993).  Accordingly, any misrepresentation regarding the

Defendants' prediction of "significant growth" is immaterial.

Finally, a defendant's alleged misrepresentations or omissions may be immaterial as a matter of law if accompanied by sufficient cautionary statements. The "bespeaks caution doctrine," created by this Court in Polin v. Conductron Corp., 552 F.2d 797, 806 n.28 (8th Cir. 1977), and recently reaffirmed in Moorhead v. Merrill Lynch, 949 F.2d 243, 245-46 (8th Cir. 1991), provides that

when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993). The cautionary language must "relate directly to that by which plaintiffs claim to have been misled." Kline v. First Western Gov't Sec., Inc., 24 F.3d 480, 489 (3d Cir. 1994); see also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991) (noting that "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.").

A dismissal of a securities fraud complaint under Rule 12(b)(6) should be granted under the bespeaks caution doctrine only where "the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (citations and quotations omitted) (emphasis in original), cert. denied, 116 S. Ct. 1422 (1996).

In this case, the district court properly dismissed the Plaintiffs' Section 11 and Section 12(2) claims,

contained in counts I and II of the Plaintiffs' complaint, because the Defendants' cautionary statements rendered immaterial all of their alleged misrepresentations. "We can say that the prospectus here truly bespeaks caution because, not only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement[s] the plaintiffs challenge." In re Trump, 7 F.3d at 372.

For example, in their complaint, the Plaintiffs argue that the Defendants misrepresented Gateway's obligations to pay sales taxes to states other than South Dakota. While never asserting that Gateway was liable for, or actually paid, non-South Dakota sales taxes prior to the December 7, 1993 public offering of stock, the Plaintiffs allege that the Defendants had entered into negotiations with various states regarding Gateway's obligations to pay non-South Dakota sales taxes. See Am. Compl. at 43.[10] In Gateway's prospectus, the Defendants specifically warned that "[t]axing authorities in certain other states have solicited information from the Company to determine whether the Company has sufficient contacts with such states as would require payment of income taxes or collection of sales and use taxes from customers in those states. The Company has not . . . established any reserves for payment of such taxes. . . . In the future, the Company may be required to collect sales and use taxes or to pay state income and franchise taxes in states other than South Dakota." Prospectus at 9. Clearly, any reasonable investor would be on notice that Gateway faced potential state tax liability for states other than South Dakota, and could not have been misled by the prospectus to believe that Gateway did not face such potential liability.

Similarly, the Plaintiffs' allegation that the quality and desirability of Gateway's portable computer products was misrepresented does not constitute a material

_____

[10]At oral argument, the Defendants represented that, during the first quarter of 1994, well after the December 7, 1993 public offering of stock, Gateway entered into an agreement with various states to pay non-South Dakota sales taxes.

misrepresentation in light of the Defendants' cautionary statements. The Defendants went to great lengths to warn potential investors that, due to the nature of a volatile industry, new product lines of computers represent a risky venture.  See id. at 7.  Specifically referencing  the "numerous new products and features" that Gateway introduced in 1993, the prospectus warned that "[t]here can be no assurance that these products or features will be successful . . . ."  Id.  In light of this explicit cautionary statement, no reasonable investor could have been misled that Gateway's new portable

products, which represented a small fraction of Gateway's total sales, were anything but a risky venture.

Furthermore, the Defendants provided explicit warnings which render immaterial the alleged misrepresentations regarding Gateway's obsolete and defective inventories, deficiencies in Gateway's purchasing and inventory control systems, management information and order systems, and management and forecasting procedures. Gateway's prospectus advised that, "[a]lthough the Company attempts to forecast growth accurately, the Company has experienced, and may continue to experience, problems with respect to the size of its work force and production facilities and the adequacy of its management information systems and inventory controls. These problems can result in a high backlog of product orders and delays in customer service and support. . . ." Id. Any reasonable investor apprised of these warnings would not be misled to believe that Gateway did not face potential problems in these areas.

Only by discarding common sense and ignoring the multitude of explicit and on-point warnings contained in Gateway's prospectus could investors have been misled by the misrepresentations allegedly made by the Defendants in Gateway's prospectus. Because a reasonable investor would not have ignored such warnings, these alleged misrepresentations are immaterial as a matter of law.[11]

---

[11]Relying on Gustafson v. Alloyd Co., 115 S. Ct. 1061 (1995), the Defendants argue, for the first time on appeal, that relief under Section 11 and Section 12(2) is unavailable to those who purchase stock from the open market rather than directly from a company at a public offering. Because the Plaintiffs did not allege that they

## III.

The Plaintiffs argue that the district court erred in dismissing their Section 10(b) and Rule 10b-5 claims, contained in count IV of their complaint, for the Plaintiffs' failure to plead fraud with sufficient particularity. We disagree.

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." In the context of securities litigation, this particularity requirement serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel <u>in terrorem</u> settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

<u>Weisburgh v. St. Jude Med., Inc.</u>, 158 F.R.D. 638, 642 (D. Minn. 1994), <u>aff'd</u>, 62 F.3d 1422 (8th Cir. 1995) (unpublished) (per curiam).

---

purchased the stock from Gateway during the public offering, the Defendants argue that the Plaintiffs have failed to state a cognizable claim. Because we affirm the district court's dismissal of the Plaintiffs' complaint on other grounds, we decline to consider this argument.

This Court has explained that, for Rule 9(b), "'[c]ircumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby. . . . [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995) (quotations and citations omitted); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("[T]he circumstances [constituting fraud] must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story. None of this appears in the complaint, although the flood of information released about Continental

Bank since 1984 offers ample fodder if there is indeed a tale to tell." (quotations omitted)); Bennett v. Berg, 685 F.2d 1053, 1062 (8th Cir. 1982) ("The location of other allegedly false statements is said to be a 'pamphlet,' 'promotional material,' or a 'typical life-care contract.' These allegations are not sufficiently particular to satisfy Rule 9(b)." (footnote omitted)), superseded and reinstated in relevant part on rehearing en banc, 710 F.2d 1361 (8th Cir. 1983); In re Lifecore Biomedical, Inc. Sec. Litig., 159 F.R.D. 513, 516 (D. Minn. 1993) (Rule 9(b) requires that "the complaint must allege the time, place, speaker and sometimes even the content of the alleged misrepresentation."). Where "allegations of fraud are explicitly or, as in this case, implicitly, based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief." Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991).

We agree with the district court that the Plaintiffs' complaint is entirely lacking in the particularity required by Rule 9(b). For example, the Plaintiffs allege that:

> In an effort to boost Gateway's earnings and thereby increase the marketability of Gateway stock, the Controlling Shareholders caused [Gateway Service Corporation] to purchase $6 million of product from Gateway at prices far in excess of their fair market value, which had a material favorable effect on Gateway's razor-thin net margins. Likewise, [Gateway Service Corporation] sold Gateway $4 million of products and services at lower than fair market value in a similar attempt to improve Gateway's financial performance in advance of the Offering. A

significant    amount    of    these    fraudulent
transactions took place in the third quarter of
1993, artificially boosting Gateway's unaudited
financials just prior to the Offering.

Am. Compl. at 41.

This allegation of fraud is simply not particularized.
Plaintiffs fail to identity  the goods and services
allegedly purchased and sold by Gateway at deflated and
inflated

prices. The Plaintiffs fail to allege the amount of fraudulent profit allegedly obtained by Gateway. Although the Plaintiffs declare that a total of $10,000,000 in goods and services were bought and sold, the Plaintiffs fail to provide the source for the gross amounts they allege. The Plaintiffs provide the barest clue as to when the alleged fraud took place, and the Defendants are left to guess which controlling shareholders were responsible for this alleged fraud. Neither this nor the Plaintiffs' other allegations of fraud meet Rule 9(b)'s particularity requirements, and the district court properly struck them.[12]

**IV.**

Finally, the Plaintiffs argue that the district court erred in dismissing their complaint with prejudice and denying them leave to amend their complaint after its dismissal. We disagree.

Although a motion to amend a complaint should be freely given under Federal Rule of Civil Procedure 15(a), "different considerations apply to motions filed after dismissal." Humphreys v. Roche Biomedical Lab., Inc., 990 F.2d 1078, 1082 (8th Cir. 1993). The Humphreys court explained that:

---

[12]Because the Plaintiffs presented no actionable claim for violation of Section 11, Section 12(2), Section 10(b), or Rule 10b-5, the claims for controlling person liability were also properly dismissed. See Van Dyke v. Coburn Enter. Inc., 873 F.2d 1094, 1100 (8th Cir. 1989) (Section 15); Deviries v. Prudential-Bache Sec., Inc., 805 F.2d 326, 329 (8th Cir. 1986) (Section 20(a)).

After a complaint is dismissed, the right to amend under Fed.R.Civ.P. 15(a) terminates. Leave to amend may still be granted, but a district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for the failure to present the new theory at an earlier time.

Id. (quotations and citations omitted).

The Plaintiffs in this case have failed to provide any valid reason for failing to amend their complaint prior to the grant of summary judgment against them. Accordingly, we conclude that the district court did not abuse its discretion in denying them leave to amend their complaint after it had been dismissed under Rule 12(b)(6).

**V.**

While it is unfortunate that the Plaintiffs in this case lost money in their investments, their misfortune alone does not create a viable cause of action. "The federal securities laws should not be mistaken for insurance against risky investments; the federal reporters are replete with failed attempts to do just that. Securities laws protect investors against fraud; they do not provide investors with a recourse against unsuccessful management strategies." Searls v. Glasser, 64 F.3d 1061, 1069 (7th Cir. 1995). As the district court noted, Judge Frank Easterbrook's description of the litigation in another case succinctly and accurately describes the instant case as well:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects

-38-

fraud, Plaintiffs may not proffer the different financial statements and rest.  Investors must point to some facts suggesting that the difference is attributable to fraud.

DiLeo, 901 F.2d at 627 (quoted in part at Mem. Op. and Order II at 14).  The Plaintiffs in this case have simply failed to produce an actionable complaint. Accordingly, we affirm the district court's dismissal of their claims against the Defendants.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.