FAGG, Circuit Judge.
This is a class action securities fraud case against KPMG Peat. Marwick (KPMG) as' auditor of the Piper Funds Inc. Institutional Government Income Portfolio (the Fund). The members of the plaintiff class (the Investors), approximately 8000 shareholders who invested in the Fund between September 30, 1991 and April 11, 1994 (the class period), appeal from the district court’s order granting summary judgment in favor of KPMG. Although the Fund’s prospectuses discussed most of the Fund’s investments and their risks, the Investors contend the Fund’s investments violated three of its own self-imposed investment restrictions, and KPMG failed to meet its duty to disclose these violations. We will call these investment restriction claims the noncompliance claims. The Investors also brought a nondisclosure claim, contending KPMG failed to reveal that the Fund’s portfolio had a longer average life, and thus was riskier, than the Fund said it' had. Without contesting any of these four claims, KPMG argued anything it omitted to say would not have significantly altered the mix of available information, so the claimed omissions were immaterial as a matter of law. The district court agreed with KPMG, but we do not. We reverse and remand for further proceedings.
Some explanation of the Fund’s investments will help orient the reader to this factually complex case.. Unless otherwise noted, we rely on the Fund’s own prosper-, tuses for our information. During the class period, the Fund invested primarily in mortgage-related securities. The Fund bought mortgage-backed securities familiarly known under names like Fannie Mae and Freddie Mac. These securities are issued by federal entities that assemble pools of mortgage *1142 loans, and the security entitles its holder to receive a portion of the principal and interest payments on the underlying loans. The Fund also traded heavily in a variety of mortgage-backed derivatives. These included collateralized mortgage obligations (CMOs), which divide up principal and interest flowing into a mortgage pool into shares of various classes or “tranches” with different payment priorities. For a more detailed explanation of CMOs, see Banca Cremi S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1022-23 (4th Cir.1997) (Magill, J.). Some of the Fund’s CMOs were 'floating rate CMOs, with rates subject to periodic readjustment in step with a particular index, like án adjustable-rate mortgage. Others were inverse or reverse floating CMOs, with adjustable rates that move against the index. The Fund also bought interest-only and principal-only stripped mortgage-backed securities (SMBSs). As their names suggest, these securities deliver distributions from either interest or principal payments, but not both. The Fund’s derivatives were highly sensitive to interest-rate change. According to the Investors, when the Federal Reserve Board raised interest rates in 1994, the Fund was heavily invested in principal-only SMBSs and inverse floating CMOs, both of which are especially hard hit when interest rates go up.
In addition, the Fund engaged in “forward commitments.” In these transactions, a security is bought or sold at a fixed price, but payment is delayed until a future date. Meanwhile, the value of the security may fluctuate, resulting in a gain or loss when payment day arrives. The Fund also entered into repurchase agreements, buying securities subject to the seller’s agreement to repurchase them after a stated period of time. Repurchase agreements can be characterized as loans, with the bought-and-resold security functioning as collateral. See 15 U.S.C. § 80a-2(a)(23) (1994) (“ ‘Lend’ includes a purchase coupled with an agreement by the vendor to repurchase; ‘borrow5 includes a sale coupled with a similar agreement.”). All of these various investments and transactions — CMOs, floating and inverse floating CMOs, SMBSs, forward commitments, and repurchase agreements — were disclosed by the Fund, along with their risks.
In a letter to shareholders dated April 12, 1994, the Fund revealed for the first time that it had also engaged in what it called, a “sale forward program,” which “involve[d] the sale of securities and a simultaneous agreement to repurchase them at a later date.” As a result, the letter said, the Fund was “[cjurrently ... 35% leveraged.” Based in part on this letter, the Investors contend the Fund was on the borrowing as well as the lending side of repurchase agreements. From the borrowing side, the transaction is called a reverse repurchase agreement. See Securities Trading Practices of Registered Investment Companies, Investment Company Act Release No. 10,666, 6 Fed. Sec. L. Rep. (CCH) ¶ 48,525, at 37,553-4 & n.2 (Apr. 18, 1979). The Investors claim the Fund’s reverse repurchase agreements took the form of dollar rolls, which “can be thought of as a collateralized borrowing, where an institution pledges mortgage pass-throughs to a dealer to obtain cash.” Steven J. Carlson & John F. Tierney, Collateralized Borrowing via Dollar Rolls, in The Handbook of Mortgage-Backed Securities 1019, 1020 (Frank J. Fabozzi ed., 3d ed.1992). Based on internal KPMG documents, the Investors contend KPMG knew of the Fund’s dollar rolls.
We turn now to the Investors’ three noncompliance claims. The Fund’s prospectuses stated that,- among other prohibitions, the Fund could not borrow money, issue senior securities, or invest in securities “which in the opinion of the Fund’s investment adviser at the time of such investment are not readily marketable.” (This last restriction was later changed to a nonfundamental policy, as disclosed in the Fund’s prospectus dated February 1, 1994.) As fundamental investment policies, these three restrictions could be changed only by the shareholders themselves. See 15 U.S.C. § 80a-13(a)(2), (3) (1994).
First, the Investors contend the Fund’s undisclosed dollar rolls violated the no-borrowing rule. The Investors claim the Fund’s forward commitments also violated the same restriction. Forward commitments generate leverage. See 6 Fed. Sec. L. Rep. ¶ 48,525, at 37,553-6. Creating leverage, the Investors say, is really the same as borrowing *1143 because in either case the shareholders achieve a right to return on a capital base that exceeds the sum of their contributions. See id. ¶ 48,525, at 37,553-5 n. 5. Second, the Investors claim some of the Fund’s investments in derivatives violated the rule against buying illiquid or not readily marketable securities. The Investors base this claim in part on the prospectuses of other funds managed by the Fund’s investment adviser during the class period. According to the Investors, these documents describe as illiquid the same kinds of securities the Fund was buying. The Investors contend KPMG knew the Fund was buying illiquid securities, based on a 1992 document in which KPMG characterized a large number of the Fund’s holdings as “thinly traded” and reported it was unable to obtain secondary price quotations for 52% of the Fund’s portfolio. Third, the Investors claim the Fund’s forward commitments involved the issuance of senior securities, see id. ¶ 48,525, at 37,553-6, because the Fund failed to segregate sufficient liquid assets to cover these commitments, as the Securities and Exchange Commission (SEC) requires, see id. ¶ 48,525, at 37,553-8.
The Investors’ nondisclosure claim concerns the following statement: “The Fund expects to maintain an average weighted life of its portfolio securities (other than inverse floating CMOs) ranging from approximately three to five years.” According to the Investors, this statement led them to believe the Fund was a short-term and thus comparatively safe fixed-income investment, a belief the Investors say the Fund reinforced by comparing its performance with that of the Merrill Lynch 3-5 Year Treasury Bond Index and by. advertising its first-place ranking among short-term government funds. The Investors contend the actual average life of the Fund’s portfolio, inverse floaters included, was at least fourteen years. Because risk increases as the average life of a debt-securities portfolio lengthens, the Investors believe the Fund’s three-to-five-year average life projection was materially misleading, and KPMG should have shed light here as well.
When the Federal Reserve Board tightened monetary policy early in 1994, interest rates rose and the price of Fund shares fell sharply. The Investors filed suit against the Fund and its investment adviser in. May 1994. That lawsuit settled. The Investors brought this action against KPMG in August' 1994, asserting federal claims under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k (1994); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994), and' Rule 1 Ob-5, 17 C.F.R.' § 240.10b-5 (1994); and §§ 34(b) and 47(b) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), -46(b) (1994). The Investors also asserted supplemental state-law claims of negligence and negligent misrepresentation. After extensive discovery, KPMG filed a motion for partial summary judgment on the Investors’ federal-law claims. Although KPMG now takes issue with the Investors’ factual assertions, KPMG contested none of them in its summary judgment motion. That being so, we must accept the facts asserted in the Investors’ complaint as true. See Kegel v. Runnels, 793 F.2d 924, 927 (8th Cir.1986). Neither did KPMG dispute the scope of its potential liability under the federal securities laws. Instead, KPMG took the position that the Investors were complaining solely about risks inherent in the Fund’s investments. KPMG argued that because those risks were fully aired by the Fund and in the media, anything KPMG may have omitted to disclose about what it calls “subsidiary issues” was immaterial as a matter of law. KPMG also contended the claims of class members who purchased Fund shares before August 1, 1993 were time barred. The district court declined to rule on the statute of limitations issue, but granted KPMG’s motion on the materiality ground for reasons we will explain below. After the district court made its summary judgment ruling, the parties agreed to a dismissal without prejudice of the remaining state-law claims, and the district court entered final judgment in favor of KPMG. This appeal followed.
We review de novo the district court’s order granting summary judgment. See Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243, 245 (8th Cir.1991). We must affirm if the record, viewed in a light most favorable to the Investors as the nonmoving party, shows there is no genuine issue as to any material fact and KPMG is entitled to judgment as a matter of law. See id.; Fed.R.Civ.P. 56(c). To be actionable *1144 under the federal securities laws, misrepresentations or omissions must be material. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir.1997). For an omission to be material, there must be “ ‘a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.’ ” Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983-84, 99 L.Ed.2d 194 (1988)). Although materiality may be decided as a matter of law in appropriate cases, see id. at 546-48, courts should bear in mind that “[t]he [materiality] determination requires delicate assessments of the inferences a ‘reasonable shareholder’ would draw from a given .set of facts and the significance of those inferences to [the shareholder],” TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2132-33, 48 L.Ed.2d 757 (1976). For that reason, unless “a reasonable investor could not have been swayed by an alleged misrepresentation” or omission, materiality “presents a factual question for a jury to decide.” Parnes, 122 F.3d at 546.
We find the district court’s reasons for rejecting the Investors’ noncompliance claims unconvincing. The district court explained its ruling this way: “No reasonable person reading the prospectuses and the financial reports could conclude that the investment restriction was meant to prohibit investment in derivatives, because these, documents all clearly stated that the Fund could and did invest in derivatives.” This analysis has several flaws. First, it distorts the Investors’ position. The Investors do not argue that all derivatives • would violate the Fund’s restrictions, merely that some of them did. Second, it fails to dispose of the Investors’ borrowing claim, which turns on the structure of Fund transactions, not on the type of securities purchased. Forward commitments and dollar rolls are not derivatives. Also, the Fund’s prospectuses never revealed the dollar rolls, which are reverse repurchase agreements and thus borrowing in the context of 15 U.S.C. § 80a-2(a)(23) and the SEC’s interpretative release, see 6 Fed. Sec. L. Rep. ¶ 48,525, at 37,553-4. Third, and more generally, the district court could not resolve the conflict between the Fund’s rules and its investment practices by reading the restrictions out of existence. The record creates a genuine dispute whether some of the Fund’s investments did in fact break its rules because a reasonable jury could conclude the rules were broken. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further on, the district court characterized the restrictions as general statements trumped by the Fund’s more specific investment disclosures. See Banca Cremi, 132 F.3d at 1031 (“[A] general statement creates less justifiable reliance than would a specific statement.”) (emphasis omitted). We disagree. The Fund specifically said it could not buy illiquid securities, borrow money, or issue senior securities. These rules have nothing in common with the sort of puffing statements this court and others have held too general to be material. See Parnes, 122 F.3d at 547 (discussing cases from other circuits).
The district court offered a second explanation for its ruling. According to the court, any failure to reveal risks created by the Fund’s claimed rule-breaking made no difference because the Investors’ losses were caused by rising interest rates, a risk the Fund did disclose. “When the total mix of information included in a prospectus clearly identifies the very risks that come to pass,” the district court said, “there is no genuine issue of fact that misrepresentations or omissions are material.” But materiality is not assessed after the fact. If it were, materiality would never present a jury question, hindsight being 20/20. Rather, a court must ask “whether the ‘reasonable investor’ would have considered the omitted information significant at the time.” Basic Inc., 485 U.S. at 232, 108 S.Ct. at 984. Otherwise, companies subject to federal securities laws could fraudulently induce investments by concealing significant risks and escape liability so long as only disclosed risks came to pass. Just because a hidden risk does not materialize doesn’t mean its concealment cannot hurt investors. The totality of available information about a particular security affects its price. See id. at 241-42, 247, 108 S.Ct. at 988-89, 991-92. Had KPMG revealed the Fund’s violations (assuming rules were broken), the Investors might have bought in at a *1145 lower price and thus lost less. Some might have shied away from the Fund entirely.
In sum, we disagree with the district court’s ruling on the Investors’ noncompliance claims. Reasonable investors reading the Fund’s prospectuses and KPMG’s reports would conclude that, whatever risks they were accepting by investing in a mutual fund that traded in derivatives and engaged in forward commitments, they were not encountering the enhanced risks created by violations of the Fund’s own basic investment policies. See 6 Fed. See. L. Rep. ¶ 48,525, at 37,553-5 (borrowing and issuance of senior securities increase speculative nature of a-fund’s portfolio). The Investors were assured there were lines the Fund could not and would not cross. The Investors contend the Fund crossed some of those lines. If they are right, and viewing the record in their favor we have to assume they are, we cannot say KPMG’s silence on these- matters did not deprive them of information that would have made a difference to a reasonable - investor. A jury might decide otherwise, but it is their call. The few related cases we have found are in step with our conclusion. See Krouner v. American Heritage Fund, Inc., No. 94 Civ. 7213(WK), 1996 WL 393584, at *3 (S.D.N.Y. July 15, 1996) (claimed violation of basic policy limiting purchases of illiquid securities is material); In re TCW/DW North American Gov’t Income Trust Sec. Litig., 941 F.Supp. 326, 339 (S.D.N.Y.1996) (claimed failure to disclose inherent illiquidity of CMO market not immaterial as a matter of law).
We turn now to the Investors’ nondisclosure claim. In the Fund’s prospectuses dated January 1993 and February 1994, the statement the Investors complain of reads: “The Fund expects to maintain an average weighted life of its portfolio securities (other than inverse floating GMOs) ranging, from approximately three to five-years.” The prospectus dated January 1992 uses the phrase “average weighted maturity” instead of “average weighted life.” The Investors prefer “effective duration.” The significance of these differences the parties do not explain, but neither do they treat them as important for present purposes. Without meaning to endorse any one of these formulas, we will use the term “average life.” •
As noted above, the Investors contend the average life of the Fund’s portfolio, including inverse floating CMOs, was at least fourteen years, making the Fund a good deal riskier than its announced three-to-five-year average life led the Investors to believe. The Investors do not claim the statement itself, which excluded inverse floaters, was a misrepresen-; tation. Rather, they argue the Fund had to say something more .to put the exclusion in context and make the projection not misleading. Quoting two statements from the prospectuses, the district court concluded the Fund had said enough. The first statement reads: “Principal prepayments on collateral underlying a ,CMO may cause it to be retired substantially earlier than the stated maturities or final distribution dates.” This statement points out the risk of shortened maturities, not the opposite risk the Investors are talking about. See Banca Cremi, 132 F.3d at 1022 (“Extension risk is. the opposite of prepayment risk.”). If anything, the quoted language suggests the portfolio’s averagé life might be shorter if inverse floating CMOs were taken into account.
The second statement reads: “Because the prepayment characteristics of-the underlying mortgages vary, it is not possible to predict accurately the realized yield or average life of a particular issue-of pass-through certificates.” This statement explains why the Fund hedged its average life projection with words like “expects,” “ranging,” and “approximately,” but it does not alert the reader to the level of portfolio maturity risk the Investors claim existed. The statement also fails to call attention to the heightened extension risk' posed by inverse floating CMOs, and thus to shed light on the inverse floater exclusion, because the prospectuses never say that inverse floaters are pass-through certificate's. See Parnes, 122 F.3d at 548 (“[Cjautionary language must relate directly to that by which plaintiffs claim to have been misled.” (internal quotations omitted)). This is not a case where reasonable minds would have to agree that the prospectuses included enough cautionary language or risk disclosure to render the challenged statements not misleading. See id. (citing Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir.1995)). Ac-’ eordingly, the warnings on which the district court relied are insufficient to render the *1146 claimed omission immaterial as a matter of law. This question as well must be left to a jury.
We reverse the district court’s ruling on both the Investors’ noncompliance claims and their nondisclosure claim, and we remand to the district court for further proceedings not inconsistent with this opinion. We express no views one way or the other on KPMG’s statute of limitations defense, leaving that issue for the district court to rule on in the first instance.