In re GRAND CASINOS, INC.,
SECURITIES LITIGATION.

No. 4–96–890.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 9, 1997.

---

Todd S. Collins, Berger & Montague, Philadelphia, PA, Srtephen D. Oestreich, Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New York, NY, Samuel D. Heins, Bryan Lee Crawford, Stacey L. Mills, Renae Diane Steiner, Vincent J. Esades, Heins, Mills & Olson, Minneapolis, MN, Ann D. White, Mager Liebenberg & White, Philadelphia, PA, Sherrie R. Savett, Andrew E. Lencyk, for Joel Blake, Gary Friedman.

Srtephen D. Oestreich, Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New York, NY, Samuel D. Heins, Bryan Lee Crawford, Stacey L. Mills, Renae Diane Steiner, Vincent J. Esades, Heins, Mills & Olson, Minneapolis, MN, Ann D. White, Mager Liebenberg & White, Philadelphia, PA, Sherrie R. Savett, Andrew E. Lencyk, for Kevin Malakouti, Robert Friedland, Robert D. Marcus.

Craig W. Gagnon, Michael J. Bleck, Michael E. Keyes, Christopher Cain, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, for Grand Casinos, Inc., Lyle A. Berman, Patrick R. Cruzen, Timothy J. Cope, Stanley M. Taube.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

TUNHEIM, District Judge.

This shareholder class action arises out of the investment of Grand Casino, Inc. ("Grand") in a project known as Stratosphere, a Las Vegas attraction containing a casino, hotel, and entertainment complex. Plaintiffs seek to represent a class consisting of all persons (except defendants) who purchased Grand common stock during the period from December 19, 1995 through July 22, 1996. In the Consolidated Amended Class Action Complaint ("Amended Complaint"), plaintiffs allege defendant Grand and individual defendants Lyle Berman, Patrick R. Cruzen, Stanley M. Taube, and Timothy J. Cope issued false and misleading statements concerning the fiscal health and financial prospects of Grand, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), Rule 10(b)(5) promulgated thereunder, and Section 20(a) of the Act, 15 U.S.C. § 78t(a).

Plaintiff Gary Friedman also seeks to represent a subclass consisting of all persons (except defendants) who purchased Grand common stock during the period from February 14, 1996 to February 22, 1996. Friedman alleges this subclass ("Insider Trading Class") was not informed of material information in possession of certain individual defendants at the time they sold portions of their Grand stock, in violation of Section 10(b), Rule 10(b)(5), and Section 20(A) of the Act, 15 U.S.C. § 78t–1.

This matter is before the Court on defendants' motion to dismiss the Amended Complaint with prejudice. Defendants argue that the Complaint should be dismissed under Fed.R.Civ.P. 12(b)(6) pursuant to the "bespeaks caution" doctrine and for failure to plead material misrepresentations with sufficient particularity under Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u–4(b)(1) and (2). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

### I. Pertinent Facts as Set Forth in the Amended Complaint [1]

Grand is a Minnesota corporation that develops and manages casinos and bingo facilities. Beginning in 1993, Grand began purchasing shares of Stratosphere, a Delaware corporation, and ultimately came to own forty-three percent of the corporation. Stratosphere is the owner and operator of the Stratosphere Tower, Casino & Hotel, a casino, hotel, and entertainment complex located at the north end of the Las Vegas Strip. Individual defendants Berman, Cruzen, and Taube were officers and directors of Grand and directors of Stratosphere. Cope was an officer of Grand. In addition, Berman was

---

1. Because defendants have moved to dismiss this action under Rules 12(b)(6) and 9(b) and under the Reform Act, the Court will set forth the factual allegations in the Complaint as if true, in order to determine whether plaintiffs have stated a claim on which relief can be granted and whether they have pleaded fraud with sufficient particularity.

the CEO of Stratosphere during the relevant period. Each of these individuals purchased Grand common stock at various times.

Stratosphere was formed in 1993, and later that year, Grand purchased a one-third share in the corporation. According to various public statements, Stratosphere was to provide twenty percent of Grand's revenues.

The Stratosphere complex was to be built in two phases. Phase I was to include the initial portions of the hotel, casino, and tower. Its anticipated completion date was April 1996.

On November 15, 1995, Stratosphere announced that it would offer ten million shares of its stock to the public, the proceeds of which would be used to finance the "Phase II" expansion of the hotel, casino, and entertainment portions of Stratosphere. This announcement culminated in a December 19, 1995 common stock offering. The Registration Statement that accompanied the public offering ("offering materials") described in detail the plans and financing for the Stratosphere project. The offering materials stated that the proceeds of the offering and $8.7 million in proceeds from the previous exercise of warrants would be used to fund Phase II.[2] The materials were signed by Berman, Taube, and Cruzen.

Grand's stock had been trading around $10 for the first several months of 1995. As a result of a series of positive statements by defendants regarding Stratosphere, Grand's stock price rose into the low and mid $20 range during 1995, and climbed to a price of over $35 per share on February 9, 1996, about two months after the December 1995 stock offering. Between February 14, 1996 and February 22, 1996, Berman, Cope, and Taube, sold an aggregate of 1.6 million shares of Grand stock, worth more than $50 million.[3]

Prior to the opening of the Stratosphere complex, Stratosphere, at defendants' di-

rection, and Grand issued numerous, additional positive statements regarding Stratosphere's construction and financial outlook.[4] For example, on March 14, 1996, Stratosphere issued a press release stating that it would be open in late April and that "[c]onstruction has been proceeding very well, and at this time we are able to pinpoint our completion date and announce the opening." The release went on to state that Phase II construction was proceeding "full speed ahead." On March 29, 1996, Grand filed its Form 10–K which again stated, among other things, that Phase II "will be funded with the proceeds from the recently completed Equity Offering" and "is expected to be substantially completed in late 1996." None of these reports or other disclosures mentioned delays or construction cost overruns regarding Phase I of the project.

The completed portions of Stratosphere opened on April 29, 1996. At that time, Grand's stock was selling at $33.50 per share. Although reports indicated that the opening week was successful, in the weeks following, Stratosphere's revenues were below published expectations. On June 7, 1996, Stratosphere announced that, during its first five weeks of operation, revenues fell below estimates and results were lower than expected.

On July 22, 1996 (the last day of the class period), Stratosphere announced that its second quarter earnings were far below expectations. In fact, it reported a loss of $.19 per share or $11.1 million during that period. Stratosphere's stock price collapsed. Stratosphere's difficulties also hurt Grand's performance. At the same time Stratosphere announced its second quarter results, Grand issued its financial reports showing its earnings were below analyst's expectations. Grand's stock price fell eight percent on July 23, 1996, to $20.25 per share.

It was revealed after the class period that approximately $40 million of the funds raised

---

2. The Court notes that the offering documents indicated that Phase I was to be fully funded from the initial stock offering in 1994, a note offering in March 1995, and proceeds from the exercise of warrants issued on the initial public offering. Although the documents did not state explicitly that Phase I had been fully funded by these sources, they employed of the past tense in describing this phase's funding scheme.

3. Defendants note that Berman sold only twenty percent of his stock at this point.

4. The defendants also gave positive assessments to third party analysts and experts who thereafter published positive statements regarding Grand and Stratosphere.

to complete Phase II of the project had been diverted to finance Phase I. It was also disclosed that Phase I had not yet been completed, and an additional $24.8 million still was needed to finish this portion of the project. In August, 1996, Phase II construction was suspended at the point where $142 million more still was needed to complete that portion of the project.

Stratosphere's and therefore Grand's troubles continued. On August 27, 1996, Grand announced that it expected its results for the second half of 1996 to be below estimates due to Stratosphere's operating losses. Berman announced in October 1996 that Stratosphere's debt structure was too high to make it viable property. Stratosphere filed bankruptcy on January 27, 1997. Throughout this period, Grand's stock price continued to decline.

## II. Allegations of Fraud

Plaintiffs allege a pattern of misrepresentations and omissions of material fact in annual reports, offering documents, quarterly reports, and press releases throughout the class period. Plaintiffs contend these misrepresentations and omissions artificially inflated Grand's stock price and ultimately caused the loss of millions of dollars by those who purchased Grand stock during this period.

Although the Amended Complaint contains numerous allegations of fraud, these allegations appear to fall into two broad categories: "construction allegations" and "income allegations."[5] First, plaintiffs allege that, beginning with the registration materials associated with the December offering, and continuing throughout the class period, defendants failed to disclose material facts relating to the construction of Stratosphere. In particular, they allege that defendants intentionally and knowingly hid the fact that millions of dollars raised in the December 1995 offering to fund construction of Phase II were diverted to pay for Phase I and other operations at the Stratosphere complex. They contend that defendants knew at the time of the December offering that the

funds raised, rather than being fully available to fund Phase II, would have to be diverted to cover the massive cost overruns Phase I was incurring or would incur. Thereafter, defendants knew but failed to disclose the actual cost of construction and the cost overruns on Phases I and II. They also failed to publish the fact that funds from the offering were being used to cover costs of Phase I and would be insufficient to cover Phase II. Moreover, they failed to disclose that the construction of various attractions had encountered difficulties, and that the King Kong Gorilla ride, in particular, had been delayed and would never be built because of problems that Stratosphere would not and could not resolve. These omissions regarding construction and construction costs were, according to plaintiffs, material and misleading.

Second, plaintiffs allege defendants knew or should have known that Grand's and Stratosphere's optimistic forecasts during the class period regarding the amount of business Stratosphere would attract were false and greatly exceeded internal projections. Specifically, the Amended Complaint references projections of the type and number of visitors and gamblers Stratosphere's facilities would attract, the success of the marketing program, and the revenues the business would generate. As a result of defendants' wildly optimistic forecasting, plaintiffs contend, Grand Casino's investment in Stratosphere was significantly overvalued and the risks understated. Also, plaintiffs appear to allege that defendants failed to disclose Stratosphere's problems attracting customers and raising revenues after the complex opened on April 29, 1996.

## III. Risk Disclosures

Defendants cite to various portions of the disclosure documents (relied upon by plaintiffs in the Amended Complaint) which discuss the risks associated with investing in Stratosphere. In particular, defendants quote numerous portions of the December 19,1995 Registration Statement and Grand's March 29, 1996 Form 10–K, incorporating by reference Grand's 1995 Annual Report.[6]

---

**5.** The various subject matters of the alleged fraud are set forth in ¶ 88 of the Amended Complaint.

**6.** As set forth in the next section, this Court may consider these portions of the documents in evaluating defendants' "bespeaks caution" argument.

The Registration Statement contained a section entitled "Risk Factors," which was cross-referenced on the document's first page and in the first and last sentences in the Prospectus Summary. The risk factors section of the Registration Statement was divided into subheadings, such as "Risks of New Construction," "Risks of Substantial Leverage and Debt Service," "Competition," and "Lack of Experienced Personnel."

With respect to revenues, the Registration Statement proclaimed that there was no assurance the project would be able to attract patrons or be profitable:

Any forecast of the company's future operating results is inherently subject to significant business, economic, regulatory, and competitive uncertainties and contingencies, many of which are beyond the company's control. There can be no assurance that Stratosphere will be able to attract a sufficient number of patrons and achieve the level of activity necessary to permit the company to realize currently anticipated earnings or even generate earnings before interest, taxes, depreciation and amortization sufficient to meet its payment obligations in connection with the first mortgage notes.

\* \* \* \* \* \*

No assurance can be given that the company will be able to manage Stratosphere on a profitable basis or be able to attract a sufficient number of guests, gaming customers and other customers to Stratosphere to make its various operations profitable independently or as a whole or to pay the principal or interest on the first mortgage notes.

Stratosphere also disclosed specific risks associated with construction:

Major construction projects (and particularly one the size and scale of Stratosphere) entail significant risks, including shortages of material or skilled labor, unforeseen engineering, environmental and/or geological problems, work stoppages, weather interference, unanticipated cost increases and non-availability of construction equipment. Construction equipment or staffing problems or difficulties in obtaining any of the requisite licenses, permits, allocations and authorizations from

regulatory authorities could increase the total cost, or delay or prevent the construction or opening of Stratosphere or otherwise affect the design or features of Stratosphere.

Stratosphere likewise disclosed the risk that Phase II may not be built on time or at all:

Although Phase II is currently anticipated to be substantially completed by late 1996 with the net proceeds from this Capital Offering, there can be no assurance that Phase II will be completed by that time or within the presently contemplated budget. Phase II is, of necessity, earlier in the development and construction process than Phase I and thus is subject to more uncertainty than Phase I as to timing and cost of completion. Phase II projects are not within the scope of the Completion Guarantee and thus any cost overruns would have to be funded from other sources, if available.

In addition, the Registration Statement warned investors regarding the highly competitive, Las Vegas casino/hotel industry. Later, it disclosed that the uncertainties associated with the new business:

The Company is in the development stage and does not have any historical operating income.... Accordingly, historical results will not be indicative of future operating results. Future operating results are subject to significant business, economic, regulatory and competitive uncertainties and contingencies, many of which are beyond the Company's control. While the Company believes that Stratosphere will be able to attract a sufficient number of patrons and achieve the level of activity necessary to permit the Company to meet its payment obligations in connection with the First Mortgage Notes and other indebtedness, there can be no assurance with respect thereto.

In its 1995 Annual Report, incorporated by reference in the Form 10–K, Grand reiterated these risks:

Management believes the Company will generate sufficient cashflow from operations to fund debt service on [Stratosphere's] First Mortgage Notes. However, further operating results may be

subject to significant business, economic, regulatory, and competitive uncertainties and contingencies, many of which are beyond the control of the Company.

\* \* \* \* \* \*

The Stratosphere project, which is scheduled to open in April 1996, is subject to numerous risks and contingencies, and there can be no assurance that the project will be completed on time or within budget. Stratosphere's Form 10–K, which was filed at approximately the same time, similarly disclosed the risks associated with the project, including that there was no assurance that the offering proceeds would cover the cost of Phase II or that Stratosphere would be able to realize its anticipated earnings.

### ANALYSIS

In considering defendants' motion to dismiss, the factual allegations set forth in plaintiffs' Amended Complaint are assumed to be true, and the Court will draw all reasonable inferences in favor of plaintiffs. *See, e.g., Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990). The issue before the Court is not whether plaintiffs will ultimately prevail at trial, but rather whether they are entitled to proceed with their claims. *See, e.g., Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir. 1982). Also, where relevant, this Court may consider documents relied upon in the Amended Complaint and of undisputed authenticity, even though they are not physically attached to the pleading. *See, e.g., Vizenor v. Babbit*, 927 F.Supp. 1193, 1198 (D.Minn.1996).

### I. Bespeaks Caution Doctrine and Materiality

■ Defendants argue the offering materials and other disclosures fully informed the investing public of the risks of Grand's investment in Stratosphere. Because these documents bespeak caution, defendants contend, plaintiffs have failed to state a cognizable claim for fraud.

■ In order to state a claim for securities fraud, a plaintiff must allege that a defendant made misrepresentations that were material. As the Eighth Circuit recently stated in *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir.1997), the "bespeaks caution"

doctrine provides that where misrepresentations or omissions are accompanied by sufficient cautionary statements, the misrepresentations or omissions are immaterial as a matter of law. The *Parnes* court elaborated as follows:

> [W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*Id.* (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3rd Cir.1993)).

■ The cautionary statements must relate, however, directly to that for which the plaintiffs claim to have been misled. *Id.* (quoting *Kline v. First Western Gov't Sec. Inc.*, 24 F.3d 480, 489 (3rd Cir.1994)). A dismissal under Rule 12(b)(6) should be granted under the bespeaks caution doctrine only where "the documents containing defendants' challenged statements include *enough* cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." *Id.* (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996)).

The Court finds that the risk disclosures defendants reference do not render immaterial as a matter of law the present-fact misrepresentations and omissions comprising plaintiffs' "construction allegations." Plaintiffs allege that, at the time of the December 1995 public offering and throughout the class period, defendants knew and failed to disclose that Stratosphere's construction was experiencing significant delays and cost overruns, that the funds raised during the public offering—ostensibly to fund Phase II—would be and then were diverted to fund Phase I, and that Stratosphere was experiencing various other construction difficulties. Although defendants' disclosures warned investors that the Stratosphere project may experience construction cost overruns, may not be fully funded by the December public offering and

other listed funding sources, and may not open on time, such forward-looking cautionary language does not render immaterial presently known facts regarding cost overruns and other construction difficulties. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996) (holding cautionary language cannot render a false statement of present fact immaterial); *Gray v. First Winthrop Corp.,* 82 F.3d 877, 883 (9th Cir.1996) (indicating the bespeaks caution doctrine is not applicable to misrepresentations of historical fact). By omitting any reference to that which allegedly had occurred already, defendants' disclosures could be materially misleading even though these disclosures contained specific, forward-looking warnings regarding certain risks .[7]

■ However, the Court finds that defendants' disclosures render immaterial the alleged misrepresentations and omissions comprising plaintiffs' forward-looking "income allegations," except to the extent such disclosures should have, but failed to, take into account presently known facts regarding the construction difficulties and cost overruns of Stratosphere. Defendants' published forecasts prior to April 29, 1996 regarding Stratosphere's attractiveness to tourists and gamblers, the estimated number of patrons, and the estimated cashflow were forward-looking, even though plaintiff alleges they were overly optimistic and contradicted internal projections. These forward-looking statements were accompanied in the market by straight-forward, specific disclosures regarding these risks and uncertainties associated with Stratosphere. For example, as set forth above, Grand's disclosures expressly warned that all forecasts of Stratosphere's operating results were subject to significant business, economic, and competitive uncertainties and contingencies, that there was no assurance Stratosphere would be able to attract an adequate number of patrons, and that there was no guarantee that Stratosphere would generate anticipated income. Whether or not the optimism expressed

about Stratosphere in public contradicted internal projections, the investing public was sufficiently cautioned regarding the risk that Stratosphere may not meet expectations. Thus, unless the allegedly fraudulent forecast failed to take into account or defied presently known facts regarding Stratosphere's construction troubles and costs, it is immaterial as a matter of law.

In addition, portions of some of the "income allegations" could be interpreted as also alleging that defendants failed to inform the market of presently known facts regarding Stratosphere's business performance after the complex had opened on April 29. The Court notes that plaintiffs' memorandum focuses on the "construction allegations" and only briefly suggests that defendants withheld material information regarding Stratosphere's visitors and income. Assuming *arguendo* that some of these allegations address presently known facts regarding Stratosphere's business after it opened, the Court still finds, separate and apart from the "bespeaks caution" doctrine, that such omissions were immaterial as a matter of law. First, plaintiffs never allege the May 9, 1996 announcement that Stratosphere's first week of business had matched expectations was false. Also, Stratosphere in fact announced on June 6, 1996 that results from its first five weeks of operations fell below estimates. Plaintiffs likewise do not allege this report was inaccurate or delayed. Moreover, the Amended Complaint points to no positive statements after May 9 referencing Stratosphere's actual income or number of visitors, or contradicting the June 6 report. Given that the market was informed on June 6 that Stratosphere's business was below expectations, and given that defendants issued no statements to the contrary, any alleged omission regarding Stratosphere's income or the number or type of visitors was immaterial. Although various statements after April 29 may have been materially misleading with regard to Stratosphere's and Grand's overall financial

---

7. For this reason, the alleged omissions and disclosures underlying the "construction allegations" are distinguishable from the omissions and disclosures at issue in *Parnes,* in which the court affirmed a dismissal premised on the bespeaks caution doctrine. *See* 122 F.3d at 549. In *Parnes,* the defendants had included in their disclosures cautionary statements regarding forward-looking projections and specific statements regarding the current state of the facts. *See id.* at 548–49. The *Parnes* court did not address the circumstance in which, as here, the cautionary statements were forward-looking but the alleged omissions were of presently known facts.

health, if as alleged, defendants knew about Stratosphere's construction difficulties, they were not materially misleading specifically with regard to how Stratosphere was doing in attracting visitors.[8]

Because each of plaintiffs' claims incorporates all allegations of fraud, no claim can be dismissed in its entirety. However, the Court dismisses the portion of each claim premised on defendant's forward-looking statements or non-material omissions that in no way are affected by allegations of presently known facts relating to construction difficulties and cost overruns. Specifically, allegations of fraud relating to the subject matters set forth in subparagraphs (f) through (i), (k), (*l*), and (p) of ¶ 88 of the Amended Complaint are dismissed for failing to state a claim on which relief can be granted.

## II. Rule 9(b) and the Reform Act [9]

Defendants also argue that the Amended Complaint is insufficient under Rule 9(b) of the Federal Rules of Civil Procedure and the Reform Act, 15 U.S.C. § 78u–4(1) and (2). Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." It is undisputed that requirements of Rule 9(b) apply to actions brought under the federal securities laws.

■ As the *Parnes* court recently reiterated, the purposes of Rule 9(b) are, among other things, to deter fishing expeditions of unknown wrongs designed to compel "*in terrorem* settlements" and to ensure the defendants are given sufficient notice of the allegations against them. *See* 122 F.3d at 589 (quoting *Weisburgh v. St. Jude Med., Inc.,* 158 F.R.D. 638, 642 (D.Minn.1994), *aff'd,* 62

F.3d 1422 (8th Cir.1995) (unpublished) (per curiam)). Rule 9(b) therefore requires that the complaint set forth in detail such matters as the time, place, and contents of the false representations and the identity of the person making the representation. *See id.* In other words, the complaint must specify the "who, what, when, where, and how" of the alleged fraud. *See, e.g., DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

In addition, the Reform Act makes clear that if specific facts are set forth in the complaint, they must create a strong inference of fraudulent intent:

> In any private action arising under this chapter in which plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).[10] Thus, to satisfy Rule 9(b) and the Reform Act, the Amended Complaint must set forth with particularity facts which create the strong inference that defendants knew their statements were false or misleading at the time they were made.

■ The Court finds plaintiffs' fraud allegations (relating to the construction of Stratosphere) are adequate under this standard. The Amended Complaint lists the specific documents and statements alleged to be fraudulent, who was responsible for these statements, and when these disclosures were made. The Complaint also lays out in detail the representations in various public disclosures—including the December 1995 offering materials, the March 14, 1996 press release, and the March 29, 1996 Form 10–K—it deems misleading.

---

8. Even if this Court were to find that these present-fact "income allegations" are potentially material, the Court would dismiss these allegations based on the Rule 9(b) and Reform Act analysis set forth in the next section. Because the Court finds no allegation in the Amended Complaint referencing language (in any disclosure) after May 9, 1996 that is false or misleading as to the income from or number or type of patrons visiting Stratosphere, the Amended Complaint lacks particularity regarding this issue.

9. Only the portions of plaintiffs' claims relating to or affected by Stratosphere's construction difficulties—those that were not dismissed above—will be analyzed in this section.

10. The Court notes that at least one court in this district required a "strong inference of fraudulent intent" even before enactment of the Reform Act. *See In re Lifecore Biomedical, Inc., Sec. Litig.,* 159 F.R.D. 513, 516 (D.Minn.1993) ("[A] complaint must adduce specific facts which give rise to a 'strong inference' of fraudulent intent.").

The Amended Complaint also sets forth in detail additional operative facts supporting plaintiffs' fraud claim. Among these facts are the following:

1) Defendants were controlling persons in Stratosphere and the individual defendants were controlling persons in Grand.

2) Defendants were responsible for (and sometimes the signatories of) the disclosures to the market regarding Stratosphere and Grand during the class period.

3) The December 1995 offering documents and later disclosures indicated that the proceeds of the offering would be used to fund Phase II, not Phase I.

4) Originally, defendants were projecting that Phase I would be completed by April 1996.

5) Numerous other specified disclosures during the class period indicated the construction of Stratosphere was proceeding according to plan.

6) In these class period disclosures there was no discussion of the diversion of funding from Phase II to Phase I, actual overruns and construction delays on either phase, or other construction difficulties.

7) During the class period, Grand's stock price rose to specified high levels and then remained strong.

8) Three of the individual defendants sold their Grand stock near its high point in February 1996.

9) After July 22, 1996—eight months after the December 1995 offering—it was revealed for the first time that Phase I in fact had not been completed and had encountered massive cost overruns, that over $24 million was still needed to complete Phase I, that $40 million supposedly raised to fund Phase II had been used to fund Phase I, that Phase II construction was months and $142 million behind, and that various attractions, including the King Kong Gorilla ride had encountered severe difficulties.

10) Once Stratosphere's and Grand's problems were revealed, the price of Grand's stock plummeted.

Plaintiffs have set forth in great detail the specific fraudulent statements, those responsible for those statements, when these statements occurred, a motive for withholding negative information, and how and why they were fraudulent.[11] Thus, the Court finds plaintiffs' allegations satisfy Rule 9(b) because they specify with particularity the "who, what, when, where, and how" of defendants' fraud.[12] These detailed allegations convince the Court that this action is no mere fishing expedition and that defendants are on sufficient notice of their alleged wrongs.[13]

**11.** The Court notes that the various optimistic reports of third-party analysts and experts may be considered as part of defendants' fraud to the extent plaintiffs allege these reports were the product of statements by defendants containing material misrepresentations and omissions. *See, e.g., Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996) ("We also believe that if defendants intentionally misled securities analysts and the press in order to stave off a Xoma stock sell off, then these third-party reports would be relevant to determine Xoma's securities fraud liability.").

**12.** The Court finds that fraud has been pleaded sufficiently with regard to each defendant. First, the Court notes that the Amended Complaint often does set forth the specific, individual defendant(s) responsible for a particular disclosure. *See, e.g.,* Amended Complaint ¶¶ 37, 40, 43, 44, 49, and 50. In addition, because the individual defendants are inside, controlling persons of Grand (and Stratosphere) and allegedly acted together with regard to other disclosures, the Amended Complaint need not draw a specific connection between every alleged omission and misrepresentation and a particular defendant. *See, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) (stating that where defendants are insiders and affiliates, plaintiffs need not draw a specific connection between each alleged misrepresentation and a particular defendant); *Levine v. Prudential Bache Properties, Inc.*, 855 F.Supp. 924, 930–31 (N.D.Ill.1994) (concluding plaintiff need not specify the exact participation of each defendant where defendants acted in concert to defraud); *Jackson v. First Federal Savings, F.A.*, 709 F.Supp. 863, 878 (E.D.Ark.1988) (holding a plaintiff need not, and indeed may not be able to, plead the exact role of each defendant in a group acting in concert). Defendants cite no case law indicating the Reform Act mandates a different conclusion.

**13.** The Court finds the allegations of fraud in this case are far more detailed and particularized than those the Eighth Circuit found insufficient

Defendants contend plaintiffs' claims are mere "fraud by hindsight" because they rely on facts revealed after the class period, rather than citing to specific facts possessed by defendants contemporaneous to or before the allegedly fraudulent disclosures. The prohibition against "fraud by hindsight" is shorthand for stating that fraud is not presumed merely because a defendant made optimistic forecasts which were followed by disclosure of results that are below these expectations. *See, e.g., In re Buffets, Inc. Sec. Litig.*, 906 F.Supp. 1293, 1299–300 (D.Minn.1995). In other words, bad news alone does not necessarily indicate previous, positive statements were false or misleading "when made." *See, e .g., In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541, 1548–49 (9th Cir.1994); *Lifecore Biomedical,* 159 F.R.D. at 517.

The Court rejects defendants' contention that plaintiffs' allegations constitute mere fraud by hindsight, and finds, on the contrary, that these factual allegations give rise to a strong inference of fraud, as required under the Reform Act. The revelations after the class period set forth above do not merely convey poor results which, due to some intervening event, may not have been foreseen by management in advance. Rather, after July 22, 1996, it became apparent to the public that Stratosphere had experienced multi-million dollar construction-cost overruns, major delays, the diversion of monies from their stated purpose, and other construction difficulties. Common sense dictates that, unless there is some type of catastrophic intervening event, construction and financing problems of this type and magnitude likely develop over time, and do not become apparent to management all at once.

Assuming as true plaintiffs' underlying factual allegations, and given the short time frame from the December offering, through the opening of Stratosphere in late April 1996, to the revelations of mammoth problems beginning on July 22, 1996, it is reasonable to infer that management was on notice of these problems during the class period. Thus, while the underlying facts on which plaintiffs rely are not contemporaneous with defendants' allegedly false statements, they create a strong inference that defendants knew there were significant problems when the statements were made. *See, e.g., Fecht v. Price Co.,* 70 F.3d 1078, 1083–84 (9th Cir. 1995) (concluding the shortness of time—there two and one-half months—between when the optimistic statements were made and the negative results were revealed constitutes circumstantial evidence that the optimistic statements were false when made), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996).[14]

To this extent, the Court disagrees with the analysis set forth in *In re Stratosphere Corp. Sec. Litig.,* No. CV–S–96–708–PMP, 1997 WL 581032 (D.Nev. May 20, 1997), in which the court dismissed similar claims by Stratosphere shareholders against Grand and a number of individual defendants. The *Stratosphere* court concluded that the plaintiffs had failed to allege sufficient evidentiary facts to support an inference that defendants' statements in the December 1995 offering materials were false or misleading when made. The court first stated that, although the offering materials employed the past tense in describing the funding of Phase I, there is no language in the materials which states that the Phase I construction was fully

under Rule 9(b) in *Parnes,* 122 F.3d at 550 (holding plaintiffs provided the "barest clue" about the when, who, and what of the alleged fraud), and *In re NationsMart Corp. Securities Litigation,* 130 F.3d 309 (8th Cir.1997)(determining plaintiffs failed to sufficiently specify who prepared certain allegedly fraudulent figures and when they were prepared, which negative business trends were allegedly described inaccurately, and how various omissions were material).

14. Moreover, the weight of these allegations is bolstered by the fact that the representations in the offering materials permitted the success of the offering and allegedly inflated the value of Grand's stock prior to three individual defen-

dants making insider sales. *See id.* at 1084 (stating "[t]he weight of these averments also increases when they are read in conjunction with the Complaint's allegations that the optimistic statements permitted the successful offering of [shares]" and pointing to insider trading allegations); *see also Lifecore Biomedical,* 159 F.R.D. at 517 (suggesting that had the complaint included an allegation of insider trading, there may have been a basis for believing that earlier statements were attributable to fraud). This Court also notes that the individual defendants' sales of stock occurred only two and one-half months before the opening of Stratosphere and only five to six months before Stratosphere's enormous construction problems were revealed.

funded. *Id.* at \*14. The court then found that there were no allegations of the extent Phase I was over budget at that time and that there were "no contemporary statements, reports or events which support an inference that the statements were false when made." *Id.* In so holding, the court noted that because the $38 million in alleged cost overruns were gleaned from Stratosphere's August 1995 Form 10Q, it had no relevance to whether Phase I was over budget in December 1995. *See id.* at \*14 n. 4.

This Court views these circumstances differently. First, while it is true that the offering materials did not guarantee that Phase I would be fully funded by other sources, they *strongly* suggest that was the case, and they clearly state that the proceeds of the offering would be used to fund Phase II. This Court finds such representations may have been materially misleading when made if defendants knew at the time that Phase I already had experienced cost overruns or would experience cost overruns, and/or that the funds raised by the offering would have to be diverted to fund Phase I.

Moreover, as set forth above, the Court finds that plaintiffs' allegations create a strong inference that defendants in fact did know about such problems. There is no hard and fast rule in this circuit or elsewhere declaring that only "contemporaneous statements, reports, or events" can support an inference that the statements were false when made.[15] Where, as here, the type of problems at issue likely did not come to light all at once, revelations shortly thereafter can support an inference of earlier knowledge. *See Fecht,* 70 F.3d at 1083 ("This shortness of time is circumstantial evidence that the optimistic statements were false when made.").

The *Stratosphere* Court rejected plaintiffs' reliance on *Fecht,* pointing out that there was only a two-month gap between the optimistic statements and the "bad news" in that case. *See* 1997 WL 581032 at \*13. This Court finds the time between the events in this case, although greater than that in *Fecht,* was sufficiently short to support an inference of fraud. At the time of the public offering, defendants were predicting completion of Phase I only five months later. Three individual defendants sold a significant amount of Grand stock just over two months before the projected completion date (and opening date) while continuing to make positive statements about progress and health of Stratosphere and Grand. Just three to four months after Stratosphere opened, it began to be revealed that not only had Phase I not been finished, but also that $40 million had been diverted from Phase II to fund Phase I, an additional $24 million was still needed for completion of Phase I, and over $100 million more was needed to complete Phase II. The proximity of these events, in light of the absence of an intervening catastrophic occurrence and the enormous discrepancy between defendants' representations and what actually happened, is sufficient to support a strong inference that defendants' statements in December 1995 (and thereafter) were knowingly misleading when made.[16] Thus, this Court finds that dismissal under Rule 9(b) and the Reform Act of plaintiffs' various claims would be inappropriate.

### ORDER

Based on the foregoing, the submissions of the parties, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

---

**15.** Even in *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548–49 (9th Cir.1994), on which the *Stratosphere* court relies, the court suggests that contemporaneous facts are not required. *See also Fecht,* 70 F.3d at 1083–84 (making clear that even though the bad news was announced after the positive statements were made, this bad news can support a claim for fraud if the intervening time is sufficiently short). Although *GlenFed* and *Fecht* are pre-Reform Act cases, their discussions of what constitutes circumstantial evidence of fraud remain instructive. In addition, none of the "fraud by hindsight" cases defendants cite from this district declare that in all

circumstances, only contemporaneous facts are sufficient to support an inference of fraud.

**16.** In *Fecht,* the Ninth Circuit relied on the fact that there was no intervening catastrophic event. 70 F.3d at 1083–84 ("We give this circumstantial evidence more weight in view of the absence of any indication of an intervening catastrophic event.")(citing *GlenFed,* 42 F.3d at 1549). Likewise, at this stage of the proceedings, there is no indication in this case of an intervening catastrophic event—such a sudden, unforeseen market change which substantially increased costs—affecting the construction of Stratosphere.

1. Defendants' motion to dismiss [Docket No. 19] is **GRANTED IN PART** and **DENIED IN PART.**

2. The portion of each of plaintiffs' claims relating to the subject matters set forth in subparagraphs (f) through (i), (k), (*l*), and (p) of paragraph eighty-eight (88) of the Amended Complaint are **DISMISSED WITH PREJUDICE.**

3. Defendants' motion is **DENIED** in all other respects.