In re **GREEN TREE FINANCIAL CORP. STOCK LITIGATION.**

In re **Green Tree Financial Corp. Options Litigation.**

**Florida State Board of Administration, Plaintiff,**

v.

**Green Tree Financial Corp., Lawrence M. Coss, Robert D. Potts, and Edward L. Finn, Defendants.**

Nos. 97–2666(JRT/RLE), 97–2679(JRT/RLE), 98–1162(JRT/RLE).

United States District Court, D. Minnesota.

Aug. 24, 1999.

Samuel D. Heins, Stacey L. Mills, Daniel C. Hedlund, Heins Mills & Olson, Minneapolis, MN, Jerome Congress, Charles Hellman, Milberg Weiss Bershad Hynes & Lerach, New York, NY, Leonard Barrack, Gerald J. Rodos, Robert A. Hoffman, Barrack Rodos & Bacine, Philadelphia, PA, Jules Brody, Mark Levine, Stull Stull & Brody, New York, NY, for Plaintiffs in the Stock Litigation.

Marshall H. Tanick, Daniel R. Kelly, Mansfield Tanick & Cohen, Minneapolis, MN, Stanley M. Grossman, Mark I. Gross, Patrick V. Dahlstrom, Pomerantz Haudek Block Grossman & Gross, New York, NY, Klari Neuwelt, Law Office, New York, NY, for Plaintiffs in the Options Litigation.

Robert R. Barth, Judith A. Rogosheske, Best & Flanagan, Minneapolis, MN, Michael J. Pucillo, Wendy H. Zoberman, Burt & Pucillo, W. Palm Beach, FL, for Plaintiff Florida State Bd. of Admin.

Gregory P. Joseph, David R. Buchanan, Peter R. Jerdee, Christopher V. Blum, Fried Frank Harris Shriver & Jacobson, New York, NY, Peter S. Hendrixon, Peter W. Carter, Dorsey & Whitney, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

Before the Court are three securities fraud actions arising from the same alleged course of conduct brought against defendant Green Tree Financial Corp. ("Green Tree") and several Green Tree officers and directors. Two of the actions are brought on behalf of putative classes (collectively "class plaintiffs"), one consisting of purchasers of Green Tree stock from July 15, 1995 to January 27, 1998, File No. 97–2666 ("purchasers class"), and the other consisting of traders of options on Green Tree stock during the same period, File No. 97–2679 ("options class"). In addition, the Florida State Board of Administration ("FSBA"), which purchased approximately 1.6 million shares of Green Tree common stock between January 30, 1996 to January 27, 1998, has filed its own action, File No. 98–1162.[1]

Three Green Tree officers and directors (during the relevant period) are named in all of the actions: Lawrence M. Coss, Chief Executive Officer and Chairman of the Board of Directors; Robert D. Potts, President, Chief Operating Officer, and Director; and Edward L. Finn, Executive Vice President and Chief Financial Officer. The purchasers class and options class also have named as defendants Richard G. Evans, an Executive Vice President and Director of Green Tree, and Joel H. Gottesman, the company's General Counsel and Secretary. Finally, the options class asserts claims against Robley D. Evans, Green Tree's Controller and Principal Accounting Officer during the relevant period.

All three complaints allege securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. They also allege controlling person liability under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). These actions arise out of defendants' alleged fraud in disseminating materially false and misleading public statements that artificially inflated its revenues, net income, and assets during the relevant period. Specifically, the complaints allege that Green Tree's financial statements and other announcements overstated the Company's "gain-on-sale" revenue, which represented the present value of the company's anticipated profit from securitization of loan pools. When Green Tree publicly announced that it had overstated its finan-

---

1. FSBA is an entity with authority under Florida law to invest and reinvest Florida Retirement System Trust Funds for the benefit of state employees. The Court shall refer to class plaintiffs and the FSBA collectively as "plaintiffs."

cial condition by hundreds of millions of dollars, the price of its stock plummeted. The complaints allege millions in dollars in losses resulting from the defendants' alleged fraud.

This matter is before the Court on Green Tree's motions to dismiss the three complaints. Green Tree argues that the complaints fail to meet the pleading standards set forth under the Private Securities Litigation Reform Act of 1995 ("the PSLRA"), 15 U.S.C. §§ 78u–4 and 78u–5, and Fed.R.Civ.P. 9(b) ("Rule 9(b)"), and fail to state a claim on which relief can be granted under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)").[2] For the reasons set forth below, Green Tree's motions are granted.

## FACTUAL ALLEGATIONS

The factual allegations in the three complaints are similar in virtually all material respects. Indeed, in response to the Court's inquiry regarding whether there are any important differences between the class complaints and the FSBA complaint, defendants' counsel responded that there are not.[3]

Green Tree is a diversified financial services company that provides financing for manufactured homes, home equity, home improvements, and consumer products, as well as consumer and commercial revolving credit. It was a pioneer in the securitization of asset-backed manufactured housing loans ("MH loans"). Green Tree securitizes a significant portion of its MH loans. For example, during the class period, it securitized ninety-seven percent of these loans. A large percentage of Green Tree's total earnings are derived from financing contracts for these homes.

Green Tree would pool together loans originated or purchased over the course of one to two months, until the total reached

approximately $400 million. It then sold the loans to a trust which divided up the pools into tranches to be issued as securities backed by the loans.

Under Generally Accepted Accounting Principles ("GAAP"), Green Tree's revenues and earnings are based on projections of future loan performance. Thus, in connection with each pool of loans, Green Tree computed its revenue using "gain-on-sale" accounting. Specifically, it recorded its revenue gain based on the difference between the present value of the interest to be earned on the underlying loans and the present value of the interest to be paid to investors in the loan-backed securities. This is recorded as revenue on Green Tree's earnings statement and as a balance sheet asset called "Excess Servicing Rights Receivable" ("ESRR" or "Interest Only Securities").[4] At all relevant times, gain-on-sale revenue constituted a substantial percentage of Green Tree's reported earnings. For example, in 1996, gain-on-sale receivables constituted 63.8% of the company's net revenue.

Green Tree also sold portions of its Interest Only Securities in the form of NIM certificates. The sale of NIMs are reported as part of the ESRR on the balance sheet. Green Tree bears the risk of any loss on its securitizations and NIM certificates.

Under GAAP, reasonable estimates must be used in calculating gain-on-sale revenue and adjustments (such as additions to reserves). In gain-on-sale accounting, the revenue recorded in connection with the securitization of loan pools is based on complex calculations involving a number of assumptions. The most important assumption is the loan prepayment rate, although other variables such as the

---

**2.** Green Tree's motion to dismiss FSBA's complaint came before the Court for a hearing on January 26, 1999, and its motion against the two putative classes was heard on April 22, 1999.

**3.** As set forth in the next section, the Court also may consider facts set forth in other

portions of the documents upon which the complaints rely and Green Tree's other filings with the Securities Exchange Commission ("SEC") during the same period.

**4.** Green Tree renamed the ESRR "Interest Only Securities" in 1997, pursuant to new GAAP guidelines.

likelihood of future defaults, delinquencies, economic conditions, and future interest rates also play a role. Prepayments occur for a variety of reasons, including borrower relocation, default, and refinancing (which is related to interest rate fluctuations). When a loan is prepaid—meaning that some or all of the principal amount is paid back before it is due—the interest the issuer expected to receive over the remaining life of the loan is reduced or terminated. Thus, if the assumed prepayment rates used to compute revenue are lower than actual prepayment experience, revenue and earnings will be overstated.[5]

Prepayment rates are referred to in the industry as manufactured housing prepayments or "MHP." One hundred MHP assumes a constant prepayment rate of 3.75% per annum of the unpaid principal balance of the contracts in each loan pool in the first month of the life of the contracts and then an additional 0.1% per annum in each month thereafter until the twenty-fourth month. Once the twenty-fourth month is reached, 100 MHP assumes a constant prepayment rate of six percent per annum each month.

During the relevant period, Green Tree did not disclose to the public its prepayment assumptions or other assumptions being used in calculating its gain-on-sale revenue. It stated generally that its assumptions for prepayment and default are based on "assumptions which the Company believes market participants would use." Green Tree also disclosed that the company had an allowance for expected loan losses based on experience and its management's predictions of future credit losses. It stated that the allowance would be reviewed quarterly and adjustments would be made if required by actual experience. Green Tree did have, and allegedly selectively released, information concerning actual prepayment experience in its loan pools.

During the relevant period, the loan pools Green Tree securitized in 1994 and 1995 were prepaying at significantly faster rates than defendants had assumed in calculating the company's gain-on-sale revenue. This began to occur several months after these pools were securitized. Yet Green Tree continued to use a prepayment assumption of 100 MHP for loan pools it securitized throughout 1995. Defendants note that they responded to this phenomenon during the class period by increasing prepayment and loss reserves and increasing prepayment speeds on new securitizations (starting in 1996) from 100 to 150 MHP.

The plaintiff classes also allege that defendants used various techniques to limit loan delinquencies and the amount of charge-offs taken per month. Some of these techniques included setting a cap on the percentage of delinquent loans recognized in a given month, granting unrequested loan extensions on overdue accounts, and back-dating default judgments.

All plaintiffs emphasize that defendant Coss was the dominant force at Green Tree. Until 1997, Green Tree's Board of Directors consisted only of defendants Coss, Potts, and Richard Evans and two outside directors. Potts and Richard Evans were subject to considerable influence by Coss. Pursuant to the terms of his employment agreement at the time, effective through the end of 1996, Coss received a base salary of $430,000 and a bonus equal to 2.5% of Green Tree's pre-tax income. Under this formula, Coss made $65 million in 1995 and, initially, over $102 million in 1996.

Other individual defendants also received substantial bonus compensation tied to Green Tree's earnings. For example, Potts received bonuses of $850,000 and $1,250,000 in 1995 and 1996, respectively. During both of those years, Richard Evans received bonuses of $350,000.

After the close of trading on November 13, 1997, Green Tree announced that it would take a charge for the fourth quarter of 1997 by increasing its prepayment re-

---

**5.** If this occurs, GAAP requires that a charge to earnings be taken.

serves in an amount "estimated to be in the range of $125 million to $150 million," in response to higher prepayment experience on loan pools from 1994 and 1995. Indeed, while Green Tree had assumed that these pools would prepay at six percent after twenty-four months (100 MBP), they were actually prepaying at over fifteen percent. The announcement indicated that this amount was preliminary, that the company was continuing its review of prepayment rates, and that the actual valuation adjustment may be greater.

In a November 14 conference call with industry analysts, Coss stated that Green Tree had been monitoring increased prepayments—and disclosing these prepayments to the market all year—and had been taking additional reserves regularly since the fourth quarter of 1996. He then indicated that the reserve addition announced on November 13 would supplement previously taken reserves. Coss also informed the conference participants of the fifty percent increase in prepayment assumptions for loans securitized in 1996 and Green Tree's continued use of a lower rate for loan pools securitized through the end of 1995. Although Green Tree monitors its prepayment and other assumptions on an ongoing basis, defendants had chosen to take the reserve addition as a result of a recently undertaken special review of prepayment rates. Coss also made the following statement during the conference call: "I don't see any set of circumstances that would cause us to [take a substantial write down] again. And if there was any set of circumstances that would, we would have provided more."

After the press release and conference call, the price of Green Tree's stock immediately dropped almost twenty percent and analysts lowered their ratings on the company's securities. The classes note in their memorandum (although not in their complaints) that Richard Evans sold stock

for proceeds of $758,480 just two weeks prior to Green Tree's November 1997 announcement that it would take a substantial charge to 1996 earnings.

On January 27, 1998, Green Tree issued a press release announcing that it would take $200 million write down and restate its earnings for 1996.[6] It also announced that its reserve addition would be $190 million on the fourth quarter of 1997, rather than the $125 to $150 million addition anticipated in the preliminary announcement. Plaintiffs allege that this constitutes an admission that the company's earlier accounting procedures were in violation of GAAP.

A March 1998 Morgan Stanley report allegedly based on significant contacts with Green Tree senior management stated that these officials knew in November of 1997 that there were two additional valuation issues—partial prepayments and interest-rate creep—that could lead to another write down. The report also indicated, however, that Green Tree officials had believed at the time that there were positive valuation items that would offset these items.

After the January announcement, analysts further lowered their ratings for Green Tree's securities. Also, the price of its common stock fell to as low as eighteen dollars, an overall decline of 64% from a high of almost fifty dollars on October 13, 1997.

The 1996 restatement of earnings caused Coss to recalculate his bonus for that year. Based on the charge, he gave back $25.9 million. Plaintiffs allege that his bonus was not recalculated to take into account the $190 million charge for the fourth quarter of 1997, although defendants note that his 1997 bonus had not been calculated by that time. Also, these adjustments on earnings had no impact on Coss's 1995 compensation because Green

---

**6.** Defendants point out that while the write downs were significant, they constitute only a small percentage of the value of the Interest Only Securities. For example, according to the press release, the 1997 write down

amounted to less than one percent of Green Tree's $28 billion in finance receivables at year-end 1997, and the 1996 write down constituted about one percent of that year's receivables.

Tree's 1995 financial results were never restated.

Plaintiffs allege that, prior to these announcements, defendants' press releases and public filings were materially false and misleading. According to plaintiffs, contrary to defendants' public statements representing that the Green Tree used reasonable prepayment and other assumptions, defendants continued to use prepayment assumptions they knew were grossly inconsistent with actual data. Defendants also did not disclose that the credit quality of the loans was deteriorating and that the default and delinquency rates were artificially manipulated to hide poor performance. These alleged misstatements and omissions disguised the company's real financial condition, thereby inflating its stock price and benefitting the individual defendants' compensation.

In addition, plaintiffs' claim Coss knowingly misled the market during the November 14 conference call when he stated that he did not know of anything that would lead to further downward adjustments. The class plaintiffs also allege that Coss told an unnamed money manager in January 1998 that he and others at Green Tree had been aware of the prepayment problems for some time but they had delayed disclosing them hoping they would go away. They further alleged that Coss admitted during the same telephone call that defendants decided to disclose the problem when it became apparent that the situation was getting worse.

On April 7, 1998 Conseco, Inc. and Green Tree announced a merger agreement under which all of the shares of Green Tree common stock would be exchanged for shares of Conseco stock. Three months later, Conseco's financial statements reflected special charges relating to Green Tree's gain-on-sale revenue. Conseco increased the assumed prepayment rates, the discount rate, and the assumed default rates.

In support of their motions, defendants refer to a number of other public disclo-

sures during the relevant period. They note that, during the relevant period, Green Tree repeatedly disclosed that its explosive growth was largely fueled by income projected in gain-on-sale transactions. During this period, the market was also aware of the risk associated with the nature of Green Tree's earnings. The company repeatedly disclosed that the expectations used in calculating further cash flows "are subject to volatility that could materially affect operating results." Also, while it did not disclose its prepayment assumptions, it did disclose its actual prepayment experience.

SEC filings also reveal that Green Tree began increasing prepayment reserves in 1995 and continued to do so throughout the relevant period. It also assumed a 150 MHP for its 1996 loan pools.

Defendants further point out that, contrary to plaintiffs' assertion, Accounting Principles Board 20 ("APB 20") requires a restatement whenever error results from "mistakes" or "oversight." The 1996 restatement therefore does not, according to defendants, constitute an admission that it violated GAAP or committed fraud. Defendants emphasize that there is no dispute that Green Tree had been substantially increasing prepayment reserves since early 1996, which is an adjustment designed to address prepayment rates that exceed the assumptions. In addition, during the relevant period, Green Tree's independent auditors reviewed the underlying data and assumptions and concurred with Green Tree's calculations.

Relying primarily on other SEC filings and undisputed stock prices, the individual defendants note that they owned more Green Tree stock and options at the end of the relevant period than they did at the beginning, and they lost millions of dollars when the 1996 restatement and 1997 reserve addition were announced. Moreover, Potts, Finn, and Gottesman purchased over $870,000 worth of stock on the open market at the same time they allegedly were inflating the price.[7] Coss in-

7. Potts and Gottesman purchased some of this stock during the period between the No-

creased his stock holdings during the relevant period and returned everything to which he was no longer entitled based on the recast 1996 earnings. Moreover, Richard Evans', Finn's, Gottesman's, and Potts' bonus compensation was not tied directly to Green Tree's performance, but rather was determined by the company's compensation committee. The committee never awarded defendants the maximum bonus allowed under their contracts.

## ANALYSIS

### I. Facts the Court May Consider in Determining the Sufficiency of Plaintiffs' Fraud Allegations

The issue before the Court is not whether plaintiffs will ultimately prevail at trial, but rather, whether they are entitled to proceed with their claims. *See, e.g., Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir.1982). In considering defendants' motions to dismiss, well-pleaded factual allegations set forth in plaintiffs' complaints are assumed to be true, and the Court will draw all reasonable inferences in favor of plaintiffs. *See, e.g., Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990). Also, where relevant, this Court may consider all portions of documents relied upon in plaintiffs' complaints and of undisputed authenticity, even though they are not physically attached to the pleading. See, e.g., *Vizenor v. Babbit*, 927 F.Supp. 1193, 1198 (D.Minn.1996).

■ Defendants seek to have the Court also consider certain other Green Tree

vember 1997 and January 1998 announcements.

8. In *In re Digi International, Inc. Securities Litigation*, 6 F.Supp.2d 1089, 1097 n. 5 (D.Minn.1998), this Court indicated that it would not consider evidence of the individual defendants' stock purchases the defendants raised. Unlike here, the evidence was offered without context. *See id.* The Court could not verify the circumstances surrounding the purchase of the stock—for example, whether the officers purchasing the stock were required to exercise options at that time, and therefore could not draw any conclusions based on those purchases. Here, defendants have pro-

SEC filings during the relevant period and Green Tree stock prices verified in the Declaration of Christopher V. Blum submitted to the Court in support of defendants' motion to dismiss the claims of the class plaintiffs. The Court may consider the contents of Green Tree's other filings with the SEC which are of undisputed authenticity. *See, e.g., Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2nd Cir.1991); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1353 n. 3 (S.D.Cal.1998) (considering information reflected in SEC Forms 4). Moreover, the Court takes judicial notice of the prices verified in the Blum Declarations, which are not disputed by plaintiffs. *See Allison*, 999 F.Supp. at 1353 n. 3 (taking judicial notice of stock purchases, sales, and holdings); *see also* Fed.R.Evid. 201(b)(2) (stating that courts may take judicial notice of facts "capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned").[8]

### II. Pleading Standards Under the PSLRA and Rule 9(b)

Defendants argue plaintiffs' allegations of fraud are insufficient under the pleading standards set forth in the PSLRA and Rule 9(b). There is no dispute that these standards are dispositive as to all of plaintiffs' claims.

■ Prior to the enactment of the PSLRA, plaintiffs alleging fraud were re-

vided more context, such showing that certain purchases were made on the open market. The Court does not consider the exercise of options to be significant and certainly does not believe that a few stock purchases alone would rule out fraudulent intent. However, the Court may consider the overall increase in defendants' holdings during the relevant period, the absence of significant stock sales, and the millions of dollars defendants lost in examining whether plaintiffs' allegations give rise to a strong inference of scienter. While plaintiffs object to the Court's considering these filings, they do not dispute their validity, authenticity, or accuracy.

quired to satisfy the pleading requirements of Rule 9(b). Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." As the Eighth Circuit recently reiterated, the purposes of Rule 9(b) are, among other things, to deter fishing expeditions of unknown wrongs designed to compel "*in terrorem* settlements" and to ensure the defendants are given sufficient notice of the allegations against them. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir.1997) (quoting *Weisburgh v. St. Jude Med., Inc.*, 158 F.R.D. 638, 642 (D.Minn.1994), *aff'd*, 62 F.3d 1422, 1995 WL 478388 (8th Cir.1995) (unpublished) (per curiam)). Rule 9(b) therefore requires that the complaints set forth in detail such matters as the time, place, and contents of the false representations and the identity of the person making each representation. *See id.* In other words, the complaints must specify the "who, what, when, where, and how" of the alleged fraud. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Weisburgh*, 158 F.R.D. at 641.

In pre-PSLRA decisions in this jurisdiction, courts applied Rule 9(b) strictly in the securities fraud context. *See, e.g., Weisburgh*, 158 F.R.D. at 642. In applying Rule 9(b)'s requirements in securities cases, courts in this District have indicated that the complaint must set forth facts giving rise to a strong inference of scienter. *See, e.g., In re Lifecore Biomedical, Inc. Sec. Litig.*, 159 F.R.D. 513, 516 (D.Minn.1993) ("[A] complaint must adduce specific facts which give rise to a 'strong inference' of fraudulent intent."); *see also In re Buffets, Inc. Sec. Litig.*, 906 F.Supp. 1293, 1300 (D.Minn.1995) (concluding that under Rule 9(b), a complaint "must set forth the facts explaining why it is claimed that the representations were known by each of the Defendants to be untrue or misleading when they were made"). Thus,

even prior to the PSLRA, factual allegations in a complaint alleging securities fraud had to give rise to a strong inference of scienter.

The PSLRA likewise contains a particularity requirement, providing in relevant part:

[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In addition, the Reform Act requires that the specific facts set forth in a complaint create a strong inference that the defendants acted with the required state of mind:

In any private action arising under this chapter in which plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Thus, to satisfy both the PSLRA and Rule 9(b), a complaint must set forth with particularity facts which create the strong inference of scienter.

Nevertheless, the parties dispute whether the PSLRA heightened the standard for determining when alleged facts give rise to a strong inference of scienter. Defendants contend that the PSLRA's pleading standard is more stringent than the Second Circuit's pre-PSLRA standard, under which a plaintiff could plead scienter by showing facts constituting evidence of either reckless or conscious behavior or a motive and opportunity to commit fraud. *See, e.g., San Leandro Emergency Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2nd Cir.1996); *In re Time*

*Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2nd Cir.1993) (stating that the plaintiff must plead either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior"). Plaintiffs claim that this "motive and opportunity" test survived the PSLRA's enactment.

There is an ever-widening split in authority over whether this more forgiving standard remains viable in the wake of the PSLRA's enactment. Numerous courts, including one circuit court and two courts in this District, have concluded that the PSLRA imposes a more stringent pleading standard. *See, e.g., In re Silicon Graphics, Inc., Sec. Litig.*, Nos. 97–16204, 97–16240, 1999. WL 446521, at *1 (9th Cir. July 2, 1999) ("[A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of intent."). *In re Ceridian Corp. Sec. Litig.*, No. 97–2044 MJD/AJB, slip op. at 25 (D.Minn. March 29, 1999); *In re Rainforest Cafe, Inc. See. Litig.*, No. 98–74 (RHK/JMM), slip op. at 11 (D.Minn. Dec. 21, 1998); *Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42, 49 (D.Mass.1997) (same). However, the Second Circuit has concluded otherwise, stating without much analysis that the PSLRA codified the Second Circuit standard. *See Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537 (2nd Cir.1999); *see also Marksman Partners, L.P. v. Chantal Pharmaceutical*, 927 F.Supp. 1297,1311–12 (C.D.Cal.1996) (same). In addition, the Third Circuit recently agreed with the Second that "motive and opportunity" remains a viable method for pleading scienter, after undertaking a detailed analysis of the PSLRA, its legislative history, and subsequent developments. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 529–35 (3rd Cir.1999). Yet in so holding, the Advanta court took pains to clarify that the PSLRA nevertheless added rigor to the inquiry:

> Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. These heightened pleading requirements address the previous ease of alleging motive and opportunity on the part of corporate officers to commit securities fraud. Permitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. After the [PSLRA], catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

*See id.* at 535 (citations omitted).

The Court believes the *Advanta* court's analysis of the issue may be the most persuasive, and, to the extent "motive and opportunity" remains a viable inquiry, *Advanta*'s admonishment regarding the PSLRA's heightened pleading requirements correctly states the plaintiffs' burden. However, the Court need not resolve definitively the issue of the appropriate standard because, for the reasons set forth below, plaintiffs have failed to plead facts sufficient to show "motive and opportunity" or strong circumstantial evidence of conscious misbehavior.

Finally, plaintiffs may demonstrate that defendants possessed the requisite scienter under the PSLRA and section 10(b) by pleading facts that give rise to a strong inference that they knew or recklessly disregarded that their statements were false. *See, e.g., Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1128 (2nd Cir.1994); *Ceridian*, slip op. at 26. Yet recklessness under section 10(b) and Rule 10(b)(5) requires more than inexcusable or gross negligence. Recklessness encompasses behavior that is "an extreme departure from ordinary care, which presents a

danger of misleading the public that is either known to the defendants or so obvious that the defendants must have been aware of it." *See, e.g., Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3rd Cir.1979)); *Friedberg,* 959 F.Supp. at 49 n. 2 (same); *see also Silicon Graphics,* 1999 WL 446521 at *1 (stating that only allegations that support a finding of deliberate or conscious recklessness are sufficient to establish a strong inference of scienter). Only if defendants' behavior rose to this level can it be viewed as fraud. *See, e.g., In re Baesa Sec. Litig.,* 969 F.Supp. 238, 241 (S.D.N.Y.1997) (stating recklessness is some form of "conscious disregard").

## III. The Sufficiency of Plaintiffs' Allegations Supporting Their Section 10(b) and Section 20(a) Claims.

It is worth noting at the outset that both parties have cited legions of cases from this Court and elsewhere to support their respective positions on the issue of the sufficiency of the complaints. While the Court finds these decisions are helpful as guideposts, no other decision or holding can be dispositive in these circumstances. The inquiry under the PSLRA and Rule 9(b) is inherently case specific, and the mix of allegations in each case is unique. Thus, for example, while incentive-based compensation, alleged GAAP violations, or the timing of various disclosures each may form part of the basis for finding a strong inference of fraud in certain circumstances,

each (or all) may not in other contexts. The weight to be given to any factual allegation or set of allegations depends on the total mix of allegations in the particular complaint(s) before the Court. The Court therefore reviews the allegations in the complaints in this case on their own merits, and its analysis applies only to the unique set of allegations presented here.

Defendants contend that plaintiffs' complaints fail to satisfy the requirements of the PSLRA and Rule 9(b) because their allegations of fraud lack particularity and do not give rise to a strong inference of scienter, and fall within the PLSRA's safe harbor protection for forward-looking statements.[9] Defendants also offer a number of other arguments in support of dismissal under Rule 12(b).

■ As an initial matter, the Court finds that most of plaintiffs' factual allegations regarding the nature of the Interest Only Securities, Green Tree's earnings, and defendants' public statements or disclosures are sufficiently particularized, with one significant exception. The class plaintiffs' allegation that Coss admitted to an unnamed money manager in 1998 that defendants had been aware of the prepayment problem for some time and had hoped that it would go away lacks the particularity required for "information and belief" pleadings under the PSLRA.[10] This allegation fails because plaintiffs have not stated with particularity "all facts on which [their] belief is formed." *See*

9. In addition to its particularity and scienter requirements discussed above, the PSLRA contains a safe harbor provision for forward-looking statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* § 78u–5(c)(1)(A)(I).

10. This allegation, which is found at paragraph 178 of the purchaser class's Consolidated Amended Complaint, is open to some interpretation. If Coss's alleged admission was simply that defendants had been aware for some time that prepayments were exceeding expectations, and that they did not inform the public immediately because they hoped their

adjustments (increased reserves, etc.) and economic changes would prevent the prepayments from affecting earnings, it adds little to the other allegations. If however, Coss's statement to the money manager is construed as an admission that defendants knew that higher prepayments were affecting earnings, but they chose not to disclose this fact hoping that changes would cure any earnings deficiency, this allegation is unique and significant. The wording of paragraph 178—including the use of the term "prepayment problem"—appears to be more consistent with the former interpretation, but class plaintiffs have not clarified the intended meaning in their submissions.

§ 78u–4(b)(1). The source of such a statement obviously is a central fact (if not *the* central fact) on which plaintiffs' belief is formed. *See, e.g., Ceridian,* slip op. at 15 (holding that the source of statements made to the defendants' management is required under the PSLRA's standards for information and belief pleadings); *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 767 (N.D.Cal.1997) (stating that plaintiffs must provide the "sources from which plaintiffs obtained this information"); *see also Parnes,* 122 F.3d at 550 (stating that the plaintiff must disclose the source of information to satisfy Rule 9(b)'s particularity requirements); *DiLeo,* 901 F.2d at 627 ("Particularity means the who, what, when, where, and how: the first paragraph of any newspaper story.").

▆▆▆▆ Class plaintiffs argue that they are not required to plead or disclose the name of the money manager because this allegation is based on the "investigation of counsel" rather than on "information and belief," and because his identity is protected by the work product doctrine. In *Ceridian,* slip op. at 10–11, Judge Davis expressly rejected the argument that allegations pled on investigation by counsel are not subject to the particularity requirement. This Court agrees with Judge Davis that because an attorney is required, under Rule 11 of the Federal Rules of Civil Procedure, to investigate claims before filing a complaint, plaintiffs should not be allowed to avoid the heightened pleading standard by claiming "investigation of counsel." *See id.* Judge Davis went on to find in *Ceridian* that because plaintiffs had failed to name the

specific engineers who had informed management of the allegedly known but undisclosed problems, the allegations were insufficient to establish actual knowledge. *See id.* at 15. Moreover, the Court rejects plaintiffs' claim that the name of the money manager is protected work product: as defendants point out, the Federal Rules of Civil Procedure expressly require disclosure of material witnesses, *see* Rule 26(a)(1)(A) and (a)(3), and such an unsupported extension of the work product doctrine would eviscerate the pleading requirements of the PSLRA and Rule 9(b). Thus, class plaintiffs' money manager allegation fails for want of particularity.[11]

Assuming *arguendo* that most of plaintiffs' other factual allegations are sufficiently particularized (excluding conclusory allegations regarding scienter), the Court finds that these allegations fail to give rise to a strong inference of scienter.[12] The complaints do not allege facts which, even taken as true, raise an inference of a motive to defraud or constitute circumstantial evidence of knowing or reckless misbehavior. Given this conclusion, the Court need not address defendants' safe harbor or non-PSLRA arguments.

### A. Motive[13]

▆▆▆▆ Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1253 (N.D.Ill. 1997); *see Shields,* 25 F.3d at 1130. Plaintiffs allege that defendants had several motives to defraud the public. Most im-

---

**11.** The class plaintiffs' failure to plead and disclose the name of the money manager is troubling. Given the clear importance of such an allegation, which may go directly to the issues of knowledge and motive to defraud, it is difficult to comprehend why class plaintiffs would not specify who made the statement. Their contention that they would face an attack on the money manager's competency and credibility is unpersuasive. Competency and credibility are not issues defendants can raise on a motion to dismiss. Plaintiffs' only burden at this stage is to meet

the requirements of the PSLRA, Rule 9(b), and Rule 12(b).

**12.** Plaintiffs' allegations of a motive to defraud and scienter necessarily are conclusory, and thus, they attempt to establish defendants' state of mind using circumstantial evidence.

**13.** The complaints contain sufficient allegations of defendants' opportunity to commit fraud.

portantly, all three complaints allege that defendants—and in particular Coss—had a motive to inflate the Green Tree's performance and the price of Green Tree stock during the relevant period to enhance their incentive-based compensation. In addition, the class plaintiffs allege that defendants had a motive to defraud the public 1) to protect Green Tree's credit rating; 2) to avoid liability in a state court derivative action; 3) to make the company more attractive for sale.

█ Turning first to the issue of compensation, it is worth noting that the fact that Green Tree paid generous earnings-based compensation to Coss during the relevant period is insufficient alone to demonstrate motive or fraud. *See, e.g., Acito v. IMCERA Group,* 47 F.3d 47, 54 (2nd Cir.1995); *Shields,* 25 F.3d at 1130; *see also Digi,* 6 F.Supp.2d at 1098 (citing cases and stating that performance based compensation may form part of the basis supporting an inference of scienter but noting that such compensation alone is insufficient to support a claim for fraud). Also, the amount of his compensation during this period, although clearly shocking, does not in itself establish a motive to defraud. Plaintiffs must allege a combination of facts which may include performance-based compensation, that, taken as true, suggest some tangible benefit could be realized by the scheme.

█ Plaintiffs have not alleged facts that could support a finding that Coss or the other individual defendants actually received any gain in compensation from the alleged scheme. Coss returned a proportional amount of his 1996 bonus after the restatement. Moreover, while Coss did not return any of his 1995 bonus, Green Tree's 1995 earnings were never restated, and plaintiffs have offered no particular-

ized facts which indicate that those earnings are overstated. Likewise, the 1997 reserve addition was subtracted from Green Tree's earnings prior to the calculation of Coss's bonus for that year. Richard Evans, Finn, Gottesman, and Potts received discretionary bonuses during this period, and none of the individual defendants escaped the crash in Green Tree's stock price. Indeed, Potts, Finn, and Gotteman purchased over $800,000 in Green Tree stock on the open market during the time the stock price allegedly was inflated.[14] Thus, plaintiffs have pointed to no facts indicating that the alleged scheme produced an economic benefit for the defendants.

Nevertheless, plaintiffs contend that the defendants' scheme was a failed attempt to hide Green Tree's true financial condition in the hope that prepayments would subside, the stock price would never decrease, and they—or at least Coss—would be able to keep their inflated compensation. The Court finds that such a motive is improbable, unsupported by plaintiffs' allegations, and inconsistent with defendants' actions. If defendants had known prior to late 1997 that they had significantly overstated earnings since 1995 due to overly optimistic assumptions and the failure of remedial measures such as taking additional reserves to offset higher prepayments, it is implausible that they would have believed that they could hide this fact indefinitely. Indeed, there is no allegation in the pleadings from which it can be inferred that defendants could have concealed (forever) a significant gap between projected and actual earnings, even if prepayment speeds eventually had slowed. Furthermore, this alleged motive is premised on mere hope: even assuming that defendants knew that the company's earnings were inflated and

---

14. During this period, only Richard Evans sold stock. His isolated sale cannot demonstrate a concrete benefit or the intent to defraud, given that the other participants in the alleged scheme held their stock and purchased additional amounts. *See, e.g., Head v. NetManage,* No. C97–4385 CRB, 1998 WL 917794, at *6 (N.D.Cal. Dec. 30, 1998) (con-

cluding that insider sales of a small percentage of defendants' collective holdings is too insubstantial to give rise to an inference of scienter). Also, premising an alleged motive on Evans' sale would be inconsistent with plaintiffs' theory that the scheme was orchestrated by Coss, largely for his own benefit.

that a later turnaround could have been used to conceal past poor performance, plaintiffs allege no facts which suggest that defendants had reason to believe that economic forces beyond their control would change dramatically enough to correct the alleged earnings woes. Plaintiffs therefore allege a scheme to inflate incentive-based compensation based solely on defendants' gamble that later changes in prepayment rates would and could hide their deception. Such allegations are not sufficient to state a motive to undertake a scheme to defraud.[15]

Moreover, a scheme to delay publication of the "bad news" for financial gain is equally implausible. With the exception of the isolated sale of stock made by Richard Evans, defendants' behavior during this period—which included buying stock on the open market and generally increasing stock holdings—is inconsistent with a motive simply to delay going public with the truth. The losses defendants suffered without any corresponding benefit after Green Tree restated its 1996 earnings and took the 1997 reserve addition illustrate why such a purported motive would have been irrational. Thus, the Court rejects plaintiffs' allegation that defendants were motivated to defraud to enhance their incentive-based compensation.

 The Court finds that the other motives the class plaintiffs proffer are equally implausible. Class plaintiffs' contention that defendants wanted to protect Green Tree's credit rating fails for the same reasons as their incentive-based compensation theory. Also, the desire to maintain a high credit rating is insufficient alone to support an inference of motive because virtually every company wants to maintain such a rating. *See, e.g., San Leandro,* 75 F.3d at 814. Defendants' alleged motive to inflate the company's earnings to enhance their defense in a derivative action premised on corporate waste is similarly unbelievable. Timing alone rules out such a motive because the derivative action was not commenced until January 23, 1997, well into the class period, and the defendants disclosed the prepayment problem during the pendency of that action. Furthermore, plaintiffs failed to plead the potential sale of the company as a possible motive. Even if they had, the Court would reject it as not credible because defendants had to know that any potential purchaser of such an institution would perform due diligence before finalizing the deal. Given the central role the Interest Only Securities play in Green Tree's earnings, the individual defendants could not have believed that a potential purchaser would overlook such accounting and performance anomolies.

Finally, the Court can discern no motive for Coss to mislead the market in the November 14, 1997 conference call. Green Tree had already indicated that it had

---

**15.** The circumstances in this case are markedly different than those the Court confronted when it recognized a plausible motive regarding the "AetherWorks allegation" in *Digi.* In that case, the Court concluded that plaintiffs had alleged a motive to defraud because they had an incentive to deceive the public with regard to Digi's investment in AetherWorks and could have kept their deceit hidden if AetherWorks' performance had improved. *See* 6 F.Supp.2d at 1097, 1100. The *Digi* defendants' hope that AetherWorks would rebound was not blind, given that they were involved in managing AetherWorks and had continued to invest in it. The individual defendants in that case legitimately could have believed that they could keep AetherWorks' problems hidden in the short term, while ultimately realizing a gain from the investment.

Here, on the contrary, defendants had no control over the economic factors that drive prepayment rates; assuming *arguendo* that defendants knew that Green Tree's financial statements were substantially inflated, plaintiffs' have alleged no facts which would suggest that defendants had a basis for believing that these factors would shift dramatically, causing a curative decrease in prepayments. Furthermore, as set forth above, the Court sees nothing in the pleadings that suggests that even if prepayments changed, defendants could have kept the truth hidden. The allegations in this case therefore are more like the "new sales program" allegations in Digi that the Court dismissed because it found no motive simply to delay disclosure. *See id.* at 1100.

made a major mistake and would be making a final determination on how to address it in the near future. Coss—who did not sell any of his shares prior to the final announcement and whose 1997 compensation would not be determined until after that announcement—had nothing to gain by misleading the market at that point.

In summary, the scheme to defraud alleged here makes no sense because plaintiffs have not alleged facts that demonstrate how the individual defendants would have benefitted from such an enterprise. The allegations therefore are insufficient to show "motive and opportunity."

## B. Circumstantial Evidence of Knowing or Reckless Misbehavior

 The Court questions whether, in the vast majority of circumstances, a complaint can satisfy the PSLRA's "strong inference of scienter" requirement without containing allegations that support a plausible motive. Nevertheless, most courts appear to view "motive and opportunity" as a separate inquiry from the determination of whether the factual allegations in a complaint constitute circumstantial evidence of knowing or reckless misbehavior. *See, e.g., Time Warner,* 9 F.3d at 268–69. However, some courts have stated that when no plausible motive is shown, the strength of the circumstantial allegations must be greater. *See, e.g., Friedberg,* 959 F.Supp. at 49 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.") (quoting *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2nd Cir.1987)).

 At the outset, the Court notes that defendants had no affirmative duty to disclose its prepayment and other as-

sumptions during the relevant period, separate from its obligation not to include materially misleading statements in Green Tree's public disclosures.[16] *See, e.g., In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1432 (3rd Cir.1997) ("Except for specific periodic reporting requirements ... there is no general duty on the part of a company to provide the public with all material information."); *Time Warner,* 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). In hindsight, fuller disclosure of the assumptions underlying Green Tree's Interest Only Securities calculations would have been the better practice. Indeed, defendants' counsel informed the Court that the SEC is reviewing the possibility of requiring greater disclosure of such assumptions. Nevertheless, because Green Tree had no independent duty to disclose its assumptions, its failure to do so cannot establish fraud unless defendants' silence knowingly or recklessly rendered Green Tree's disclosures materially misleading.[17]

The thrust of plaintiffs' allegations of conscious misbehavior is that once defendants were aware that actual prepayment rates were higher than assumed, they knew that the Interest Only Securities was valued too high and that they should take corrective action. In other words, Green Tree knew that it should have been using more appropriate prepayment assumptions, and thus, had it acted appropriately, it would have reported lower earnings and equity during the relevant period.

Green Tree publicly reported actual prepayment experience and monitored prepayments throughout the class period. Defendants therefore knew during the relevant period that actual prepayment rates for the 1994 and 1995 loan pools were exceeding Green Tree's initial estimates.

---

**16.** Defendants disclosed to the public that they were utilizing such assumptions, but they did not disclose the assumptions themselves.

**17.** Also, the Court agrees with defendants that they cannot be held to account for a third-

party analyst's assumption that Green Tree was using 150 MHP in computing its gain-on-sale revenue for the 1994 and 1995 loan pools. Plaintiffs cannot impute liability to defendants for statements they did not make or endorse.

Defendants' knowledge of higher than assumed prepayment rates, however, does not give rise to a strong inference that they knew or recklessly disregarded that its earnings were overstated. Plaintiffs acknowledge that the prepayment assumption was but one, albeit significant, variable in determining the value of the Interest Only Securities and earnings. Also, Green Tree made other adjustments to account for greater prepayments, including increasing by fifty MHP the assumed prepayment rate for the 1996 loan pools and adding prepayment reserves throughout the entire period.[18] Moreover, there are no facts alleged in the complaints that indicate that early additional prepayments require an immediate adjustment in prepayment assumptions (rather than, for example, an increase in reserves). Given that there are other variables in determining earnings and that Green Tree was taking other steps to address extra prepayments, allegations regarding defendants' knowledge of actual prepayment experience, even taken in their most favorable light, do not demonstrate that defendants knew prior to late 1997 that previous earnings had been overstated. Likewise, conclusory allegations that defendants knew that increasing reserves would not be adequate to address higher prepayments cannot satisfy the requirements of the PSLRA and Rule 9(b).

Thus, plaintiffs' complaints must contain some additional fact or set of facts which would demonstrate that defendants knew before November 1997 that higher than expected prepayments would cause lower earnings (regardless of other variables or remedial measures) or otherwise give rise to a strong inference that they knew or recklessly disregarded that their earnings statements were false and misleading. *See, e.g., Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 526 (E.D.Mich.1997) (stating that a plaintiff must draw a "specific nexus between the allegedly fraudulent statements and the facts upon which the allegation of fraud is dependent"). The Court finds plaintiffs have failed to plead such facts.

Green Tree's admission in January 1998 that its previously reported earnings for 1996 were wrong, does not fill this void. First, a restatement of earnings do not constitute an admission that defendants knew or even suspected that their earlier earnings reports were overstated. *See, e.g., Digi,* 6 F.Supp.2d at 1099 n. 7; *see also In re FAC Realty Sec. Litig.,* 990 F.Supp. 416, 422 (E.D.N.C.1997) ("Merely reporting a loss in a year-end financial statement does not, of course, prove that earlier statements were fraudulent."). It also does not serve as an admission that defendants had failed to monitor prepayments and other variables on a consistent basis. Moreover, given the complexity of the calculation of the value of the Interest Only Securities and the remedial measures (increased MHP for 1996 loan pools and increased reserves) Green Tree instituted during the relevant period, the error the restatement corrected is not the type that must have been known previously.[19]

---

**18.** The Court rejects plaintiffs' apparent suggestion that Green Tree's taking of additional reserves demonstrates that defendants' earnings were inflated. Green Tree's taking such reserves and fifty MHP increase for the 1996 loan pools only demonstrates that defendants knew that actual prepayments exceeded their initial estimates for the 1994 and 1995 securitizations. Plaintiffs have offered no facts that demonstrate that adding reserves as an ongoing remedial measure somehow indicates that defendants knew that the company's earnings were inflated.

**19.** The complex interaction between the various variables and remedial measures and the inexact nature of the calculations at issue here distinguishes this case from *In re Grand Casinos, Inc. Sec. Litig.,* 988 F.Supp. 1273 (D.Minn.1997). In addition, while the 1996 earnings adjustment and the 1997 reserve addition had a significant effect on Green Tree's performance, the restatements constituted only a small percentage (approximately one percent) of the billions of dollars of securitizations in 1996 and 1997. In *Grand Casinos,* the allegations related to undisclosed construction cost overruns and the reallocation of funds from one part of the project to another.

While Green Tree's previous calculations and attempts to address higher than expected prepayments ultimately failed, this failure does not create an inference that defendants knew prior to the restatement that their attempts had been or would be unsuccessful or that earnings had been overstated.[20]

Plaintiffs contend that defendants violated GAAP by using unreasonable estimates in calculating gain-on-sale revenue and failing to make adjustments when it became apparent that the assumptions being used do not comport with reality. In certain circumstances, alleged GAAP violations can, combined with other allegations, serve as evidence of fraud. *See, e.g., Digi,* 6 F.Supp.2d at 1098–99 (citing cases); *In re Ancor Comm., Inc. Sec. Litig.,* 22 F.Supp.2d 999, 1006 (D.Minn.1998) (stating GAAP violations combined with various other facts suggesting fraud satisfied the PSLRA's scienter requirement). In the particular circumstances presented here, however, the alleged GAAP violations do not advance plaintiffs' position because they too do not raise an inference that defendants knew prior to late 1997 that their gain-on-sale revenue was overstated. Again, defendants knew early in the relevant period that prepayments were exceeding initial estimates for their loan securitizations, but there are no facts alleged which indicate they knew that their overall calculation of the gain-on-sale revenue was unreasonable, given the numerous other variables and Green Tree's taking of additional prepayment reserves to cover credit

losses. Thus, while one can allege GAAP violations in hindsight, these violations do not provide support for plaintiffs' claim that defendants' knowingly or recklessly overstated Green Tree's earnings.[21]

In addition, there is nothing about the individual defendants' compensation or stock activity that suggests that they knew and ignored that Green Tree's financial results had been overstated. As discussed above, only Richard Evans sold stock during the relevant period, while three other defendants purchased stock on the open market and the individual defendants generally increased the size of their investment in Green Tree. These facts in no way support or contribute to an inference of knowing or reckless conduct.

Finally, the ten-week gap between the November 13, 1997 announcement and the January 27, 1998 final write down does not raise an inference of knowing or reckless conduct. The temporal proximity between events such as insider stock sales or positive statements and the disclosure of the "bad news" can raise an inference of fraud. *See, e.g., Grand Casinos,* 988 F.Supp. at 1283. Here, however, the November 13 announcement was expressly preliminary: it informed the market that the negative results expressed therein were not final, and that a final statement would be published after further review. Green Tree then undertook its further review and published the final, more dismal numbers. In

*See id.* at 1276–77. Allegations of such comparatively straightforward financial problems plus the size of the cost overruns (compared with the total cost of the project) could support a finding that the defendants had to have known of the bad news prior to the ultimate revelation that the project was a financial disaster. *See id.* at 1282–83.

20. Class plaintiffs cite to a number of other alleged false and misleading statements regarding credit quality of the loan pools. After reviewing these allegations, the Court questions whether they are sufficiently particularized to meet the PSLRA and Rule 9(b) requirements and whether certain credit issues

are attributable to the defendants. In any event, these allegations are irrelevant because there is no connection alleged between these alleged falsities and the November 1997 and January 1998 write downs, on which losses are premised.

21. The Court also rejects class plaintiffs' contention that the restatement of earnings constitutes an admission that Green Tree's previous accounting practices violated GAAP at the time. Under GAAP, the purpose of a restatement is to correct mistakes or oversights. The restatement is not an admission that defendants *knowingly* made accounting mistakes or overlooked material information.

these circumstances, ten weeks is not so short a time period as to raise a strong inference that defendants knew at the time of the first announcement that the company's financial condition was worse than reported. Also, given the complexity of Green Tree's gain-on-sale accounting, knowledge or recklessness cannot be inferred from the fact that the final write down that emerged ten weeks after the initial announcement was substantially greater than the original estimate.[22] Also, Coss's statements in the November 14 conference call do not make the timing suspect and do not raise any inference that defendants actually were aware in mid-November 1997 that Green Tree's financial condition was worse than they suggested.[23]

In hindsight, there is no dispute that defendants made a substantial error in calculating Green Tree's earnings and revenue during the relevant period. The collapse of Green Tree's stock price following the November 1997 and January 1998 announcements shows that this error caused significant harm. Moreover, based on plaintiffs' allegations and the harm to the investing public, the Court sees strong merit in the contention that the SEC should require institutions like Green Tree to disclose fully the assumptions on which they base their gain-on-sale revenue and earnings. Nevertheless, plaintiffs have not alleged sufficient facts to raise a strong inference that defendants were aware that any of Green Tree's financial and other statements were false or misleading at the time they were made.

Based on this finding and the fact that plaintiffs have not alleged a plausible mo-tive, the Court holds that plaintiffs have failed to satisfy the "strong inference of scienter" requirement of the PSLRA and Rule 9(b). Plaintiffs' complaints therefore are dismissed.

## ORDER

Based on the foregoing, and all of the records, files, and proceedings herein, *IT IS HEREBY ORDERED:*

1. Defendants' motion to dismiss the claims of the purchasers class [File No. 97–2666, Docket No. 41] is **GRANTED, and all claims are DISMISSED WITH PREJUDICE.**

2. Defendants' motion to dismiss the claims of the options class [File No. 97–2679, Docket No. 24] is **GRANTED,** and all claims are **DISMISSED WITH PREJUDICE.**

3. Defendants' motion to dismiss FSBA's claims [File No. 98–1162, Docket No. 12] is **GRANTED,** and all claims are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**22.** Green Tree admitted in the January 27 press release that it previously had failed to consider fully the effect of partial prepayments and the impact of changes in projected future interest payments due to investors in securitizations "on a weighted average basis." While this admission suggests that Green Tree may have been negligent in its initial determination of the size of the write down (and in its previous calculations of gain-on-sale revenue), it does not raise an inference of fraud.

**23.** The Morgan Stanley report, when viewed in its entirety, likewise does not support plaintiffs' claim that defendants knew at the time of the preliminary announcement that a further writedown would be necessary.